**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAVID J. BATHRAS, SR., *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:26-cv-02074-RDB |
| WES MOORE, *et al.*, | * | |
| *Defendants*. | * | |

* * * * * * * * * * * *

**DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

MICHAEL DREZNER
Federal Bar No. 31784
SARA R. FABER
Federal Bar No. 21893
JOSHUA R. CHAZEN
Federal Bar No. 06837
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
mdrezner@oag.maryland.gov
sfaber@oag.maryland.gov
jchazen@oag.maryland.gov
(410) 576-6959 / 7833 / 7058
(410) 576-6955 (facsimile)

Attorneys for Defendants

# TABLE OF CONTENTS


Page

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

Conversion of Semiautomatic Firearms to Machineguns ....................................2

Certain Firearms with Cruciform Trigger Bars are Easily Convertible.....................3

3D Printing Causes an Enormous Proliferation of Switches ....................................5

The General Assembly Responds ...........................................................................8

Procedural Background...........................................................................................10

STANDARD OF REVIEW.....................................................................................10

ARGUMENT..........................................................................................................11

I. PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS. .........................................11

A. Plaintiffs' Facial Challenge is Unlikely to Succeed. ......................................11

B. The Second Amendment Does Not Protect a Right to Easily Convertible Firearms. ..........................................................................................13

C. Regulation of Easily Convertible Firearms Fits Easily into the Historical Tradition of Arms Laws. ...............................................................17

1. Historical Analysis of SB 334 Should be Nuanced. ...................................18

2. Restrictions on Armed Groups...................................................................20

3. Restrictions on Gunpowder........................................................................22

4. Restrictions on Bowie Knives.....................................................................23

5. Restrictions on Blunt-Force Weapons. .......................................................24

6. Restrictions on Machineguns, Short-Barreled Rifles, and Short-Barreled Shotguns. ..........................................................................26

7. Modern Regulation of Machineguns. ........................................................28

II. PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM. ......................................31

A. Consumer Plaintiffs Fail to Show Irreparable Injury....31

B. Instructor Plaintiffs Fail to Show Irreparable Injury....33

C. Gun Store Plaintiffs Fail to Show Irreparable Injury....35

D. Association Plaintiffs Fail to Show Irreparable Injury. ....36

III. PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH AGAINST AN INJUNCTION. ....37

CONCLUSION....38

**Cases**

*Association of Am. Railroads v. Hudson*, 144 F.4th 582 (4th Cir. 2025) .................................... 37

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024)................................................... 14

*Barnett v. Raoul*, 180 F.4th 1035 (7th Cir. 2026) .......................................................... 21, 22, 23

*Bevis v. City of Naperville,* 657 F. Supp. 3d 1052 (N.D. Ill. 2023) ............................................ 25

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc) ................................................ passim

*Bondi v. VanDerStok*, 604 U.S. 458 (2025) ......................................................................... 19

*Brown v. Gilmore*, 258 F.3d 265 (4th Cir. 2001)...................................................................... 12

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) .................................................................. 18

*Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281 (M.D.N.C. 2015) ..................... 11

*Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362 (D.D.C. 2018) ..................................................... 36

*Cockrum v. State*, 24 Tex. 394 (1859) ........................................................................................ 23

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................................ 15, 18, 28, 38

*Doe v. Jaddou*, No. CV TDC-24-0650, 2024 WL 2057144 (D. Md., May 8, 2024).................... 11

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ................................................................ passim

*Granata v. Campbell*, 798 F. Supp. 3d 46 (D. Mass. 2025) .................................................. 14, 15

*Hanover County Unit of the NAACP v. Hanover County*,
461 F. Supp. 3d 280 (E.D. Va. 2020) ....................................................................................... 37

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)......................................... 20, 32

*Holmes v. Elephant Ins. Co.*, 156 F.4th 413 (4th Cir. 2025) ...................................................... 32

*Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655 (7th Cir. 2015)............................................. 33

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)................................................................... 11, 18

*Kipke v. Moore*, 695 F. Supp. 3d 638 (D. Md. 2023) .......................................................... 31, 38

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................ 32

*Maryland Shall Issue, Inc. v. Montgomery County*,
680 F. Supp. 3d 567 (D. Md. 2023) .......................................................................................... 38

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................................................ 14

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) ........................................................ 19

*National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025)................................ 23, 24

*New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022)...................................... passim

*NJOY, LLC v. International Trade Comm'n*, No. 3:25-CV-930,
2026 WL 1697073 (E.D. Va. June 11, 2026) ........................................................ 36

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................ 37

*North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020) .............. 37

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) ............................. 22, 27

*Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782 (D. Or. 2022) ............................. 36

*People v. Brown*, 253 Mich. 537 (1931)........................................................ 26

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016)........................ 34

*Robinson v. National Collegiate Athletic Ass'n*, 172 F.4th 271 (4th Cir. 2026) ......................... 11

*Schall v. Martin*, 467 U.S. 253 (1984)........................................................ 38

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264 (4th Cir. 2002) ............................................... 31

*Staples v. United States*, 511 U.S. 600 (1994)........................................................ 2

*Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020)........................................................ 38

*United States v. Brooks*, 100 F.4th 825 (7th Cir. 2024)........................................................ 5

*United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025)........................................................ 29

*United States v. Fisher*, No. 1:23-CR-00045-MR-WCM, 2024 WL 589115
(W.D.N.C. Feb. 13, 2024)........................................................ 28

*United States v. Harrison*, No. CR 25-00187 (EGS), 2025 WL 2144077
(D.D.C. July 28, 2025)........................................................ 20

*United States v. Hudson*, No. 24-5697, 2026 WL 674368 (6th Cir. Mar. 10, 2026)...................... 6

*United States v. Lausane*, No. 2:25-CR-253-RAH-KFP, 2025 WL 2946992
(M.D. Ala. Aug. 29, 2025)........................................................ 7

*United States v. Miller*, 307 U.S. 174 (1939)........................................................ 27, 28

*United States v. Mitchell*, 734 F. Supp. 3d 702 (N.D. Ohio 2024) .............................................. 28

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
441 F.3d 416 (6th Cir. 2006) ...................................................................................... 30

*United States v. Oxley*, No. CR DLB-23-213, 2025 WL 2306238
(D. Md. Aug. 8, 2025)........................................................................................ 5, 16, 28

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) .............................................................. 13

*United States v. Rahimi*, 602 U.S. 680 (2024) ......................................................................... 17

*United States v. Rush*, 130 F.4th 633 (7th Cir. 2025) .............................................................. 27

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................................ 37

*United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250
(D. Md. Dec. 22, 2022) ..................................................................................................... 18

*United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*,
447 F.3d 686 (9th Cir. 2006) ...................................................................................... 30

*United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) ............................................................ 28

*United States v. Williams*, No. 25-4226, 2026 WL 2169099 (4th Cir. July 28, 2026) .................. 6

*VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022)................................................ 37

*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) ................................................................................ 15

**Statutes**

18 U.S.C. § 922(o) ............................................................................................................. 2, 19

26 U.S.C. § 5845(b) ............................................................................................................ 2, 29

1784 N.Y. Laws 627 ............................................................................................................... 22

1820 Ind. Acts 39 ................................................................................................................... 24

1837 Ala. Laws 7 .................................................................................................................... 24

1838 Fla. Terr. Laws 36.......................................................................................................... 24

1838 Tenn. Pub. Acts 200....................................................................................................... 24

1838 Va. Acts 76..................................................................................................................... 24

1838-39 Wis. Sess. Laws 368 ................................................................................................. 22

1839 Ala. Acts 67 .......... 24

1846 Mich. Pub. Acts. 679.......... 22

1857 R.I. Acts & Resolves 532.......... 22

1871 Tex. Laws 1st Sess. 25 .......... 24

1878 Miss. Laws 175 .......... 24

1879 N.C. Sess. Laws 231 .......... 24

1880 S.C. Acts 448 .......... 24

1881 Ark. Acts 191 .......... 24

1881 Ark. Acts 192 .......... 24

1889 Ariz. Sess. Laws 30.......... 24

Act of Apr. 15, 1850, ch. 194, § 2, 1850 Mass. Acts 401.......... 25

Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 71 .......... 25

Act of Apr. 7, 1849, ch. 278, § 1, 1849 N.Y. Laws 403 .......... 25

Act of Feb. 16, 1791, ch. 87, 1791 N.H. Laws 718 .......... 22

Act of Feb. 21, 1917, ch. 377 §§ 2-3, 1917 Or. Laws 804 .......... 26

Act of Feb. 24, 1797, ch. 637, 1797 N.J. Laws 179.......... 22

Act of July 13, 1892, ch. 159, 27 Stat. 116–17 (1892) .......... 26

Act of June 2, 1893, ch. 4125, § 3, 1893 Fla. Laws 51.......... 25

Act of Mar. 10, 1856, ch. 636, 1855-1856 Ky. Acts 96 (1856).......... 25

Act of Mar. 28, 1891, No. 257, § 1, tit. 11, § 15, 1891 Mich. Pub. Acts 388.......... 26

Act of Mar. 28, 1912, ch. 225, §§ 1-1, 1912 N.J. Laws 364 .......... 26

Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442.......... 26

Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144 .......... 26

Act of May 4, 1917, ch. 145 §§ 1-2, 1917 Cal. Stat. 221 .......... 26

Act of Nov. 12, 1849, No. 36, 1849 Vt. Acts & Resolves 26.......... 25

An Act for Further Preventing All Riotous, Tumultuous, and Disorderly Assemblies, Mass. Acts (Law Passed 1752) ..... 22

An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 10, 1922 Mass. Acts, 560 ..... 26

Md. Code Ann., Crim. Law § 4-301 ..... 9

Md. Code Ann., Crim. Law § 4-301(m)(2) ..... 3

Md. Code Ann., Crim. Law § 4-301(n) ..... 3

Md. Code Ann., Crim. Law § 4-301(o) ..... 10

Md. Code Ann., Crim. Law § 4-301(o)(3) ..... 10

Md. Code Ann., Crim. Law § 4-302 ..... 9

Md. Code Ann., Crim. Law § 4-302(13) ..... 35

Md. Code Ann., Crim. Law § 4-302(3)(ii) ..... 34

Md. Code Ann., Crim. Law § 4-305.1 ..... 3, 7

Md. Code Ann., Crim. Law § 4-305.2 ..... 9

Md. Code Ann., Crim. Law § 4-305.2(A) ..... 9

Md. Code Ann., Crim. Law § 4-306 ..... 9

Md. Code Ann., Crim. Law § 4-404 ..... 2, 7

Md. Code Ann., Crim. Law § 4-405 ..... 2

Md. Code Ann., Crim. Law § 4-405(a) ..... 7

Md. Code Ann., Pub. Safety § 5-405(b) ..... 14

Me. Stat. tit. 12, ch. 159, § 5 (1840) ..... 22

Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986) ..... 28

**Miscellaneous**

Alain Stephens & Keegan Hamilton, *The Return of the Machinegun*, The Trace (March 24, 2022) ..... 3

Andrew Touma, *When the Second Amendment Meets the Third Dimension: Bruen in the Age of 3D-Printed Firearms*, 21 Duke J. Const. L. & Pub.

Pol'y Sidebar 173 (2026) ........ 5, 19

ATF National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations Volume 4 pt. 5 ........ 6

ATF Ruling 81-4, ATF, https://www.atf.gov/resource-center/docs/atf-ruling-81-4pdf/download ........ 3

ATF, *Machinegun Conversion Devices: Fact Sheet*, https://perma.cc/SV2G-GBSJ ........ 3

Bailey K. Roberts, *et al.*, *Trends and Disparities in Firearm Deaths Among Children*, Pediatrics, Sept. 2023 ........ 7

Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal. L. Rev. 1 (2025) ........ 20

Brian New, *3D printers used to make illegal handgun switches magnifies challenges for law enforcement*, CBS News (January 10, 2023) ........ 5

Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Justice, National Firearms Act Handbook app. B (April 2009) ........ 30

Carol Robinson, *Man Arrested in Tuskegee Shooting Admits Firing Gun with Glock Switch, Denies Shooting Anyone, Records State*, AL.COM (Nov. 19, 2024, 5:18 PM) ........ 8

Carolyn Raymond-King, M.D., Ph.D., *et al.*, *Current Causes of Death Among Children and Adolescents in the United States*, Correspondence, N Engl J Med. 2026; 394:1958-1959 ........ 7

Catherine Camp, *Gun Regulation Exceptionalism and Adolescent Violence: A Comparison to Tobacco*, 48 J.L. Med. & Ethics 25 (2020) ........ 28

Dan Snyder, *ATF officers in Philadelphia Say They're Seeing More Switches to Make Guns Fully Automatic: "Keeps me up at night,"* CBS News, (May 15, 2025) ........ 16

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024) ........ 25, 26

David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev. 45 (2025) ........ 2

Derya, *Understanding Connecticut's New "Convertible Pistol" Law – And What It Means for Responsible Gun Owners*, (April 25, 2026) ........ 33

Engage Armament, Handguns: Semiautomatic, https://shop.engagearmament.com/handguns/semi-automatic-handguns ........ 36

*Garland v. Cargill and Machine Gun Conversion Devices*, 72 DOJ J. Fed. L. & Prac. 17, 27-29 (2024) ........ 4

Hannah Gaskill, *Poll: MD voters support legislation to prohibit easily convertible pistols*, The Daily Record (February 5, 2026) ........................................ 38

Jay Jones, ABC 24, *How Often Do Memphis Police Find Glock Switches?* (April 30, 2024) ........................................ 6

Md. Code Regs. § 29.03.03.10(A)(1)-(9) ........................................ 14

Miguel Torres, *3D printing makes dangerous 'Glock switch' devices easier to get, ATF says*, Arizona Republic (October 4, 2024) ........................................ 19

NIST, Additive Manufacturing ........................................ 5

Press Release, ATF, *ATF, Chicago Police Dep't Announce Results of Enforcement Initiative* (August 5, 2025) ........................................ 6

Press Release, U.S. Att'y's Off., N. Dist. of Texas, Fort Worth Manufacturer Charged in Glock Switch Case (Nov. 18, 2022) ........................................ 4

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) ........................................ 27

Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) ........................................ 19, 24

*S. Jud. Proceedings Comm. Hearing on S.B. 334* ........................................ passim

Tabrez Y. Ebrahim, *3D Printing: Digital Infringement & Digital Regulation*, 14 Nw. J. Tech. & Intell. Prop. 37, 41 (2016) ........................................ 5

The Guardian, *Seattle Police Recover Machine Gun and Ghost Gun from Scene of Mass Shooting* (July 28, 2026) ........................................ 8

*WLOS News 13, Experts explain Glock switches, at 1:08* (YouTube, July 27, 2026) ........................................ 16

## INTRODUCTION

Despite almost a century of strict regulation, machineguns again litter the streets of America. The violence of the Prohibition Era, fueled by Tommy Guns and other automatic weapons, spurred the first comprehensive federal firearm controls, which effectively banned machineguns. But criminals today have once again gained ready access to machineguns in the form of certain handguns, illegally and easily modified to allow the emptying of their entire magazine in an instant. Such weapons offer an extreme rate of fire and a similarly extreme lack of control, constituting a singularly dangerous threat to public safety in Maryland and across the country.

Two primary factors have fueled the rise of machineguns in modern America: (1) the similar design of select models of handguns, which makes them highly vulnerable to modification, and (2) the wide availability of 3D printed "machine gun conversion devices," which can be installed in such pistols in minutes. These machinegun conversion devices, also known as switches, have been banned under Maryland and federal law, but such prohibitions have not stemmed the tide of automatic weapons. Instead, switches and modified handguns are being used in and recovered from crimes at an increasing rate.

This year, responding to public outcry surrounding these weapons, the Maryland General Assembly passed, and Governor Moore signed into law, Senate Bill 334 (SB 334), a product design law that prohibits the sale of the small number of pistol models with a cruciform trigger bar and that are easily convertible to machineguns. Most handgun models offered available for sale today do not feature any of the design elements regulated by SB 334, and so are unaffected by the statute.

Two sets of Plaintiffs ask this Court to preliminarily enjoin Maryland's law, arguing that SB 334's commonsense restriction violates the Second Amendment. But pistols especially

susceptible to machinegun conversion are not protected by the plain text of the Second Amendment, and moreover, regulation of such firearms fits easily into America's historical tradition of regulating specific weapons and components that pose a disproportionate public safety threat. Nor can Plaintiffs demonstrate any irreparable harm absent an immediate injunction; they fail to show that any imminent firearm purchases will be disrupted, or that any immediate and irreparable economic injuries are likely. Maryland's compelling interests in public safety and prevention of mass violence, effectuated through SB 334, further weighs against Plaintiffs' requested relief. For all these reasons, this Court should deny Plaintiffs' motions for preliminary injunction.

## BACKGROUND

### Conversion of Semiautomatic Firearms to Machineguns.

In general, modern firearms are described as semiautomatic, where one bullet is fired each time the trigger is pressed, or automatic, where bullets are fired continuously if the trigger is held down. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Automatic firearms are also commonly described as machineguns. *See* 26 U.S.C. § 5845(b). Machineguns are strictly regulated at both the federal level and under Maryland state law, such that possession is generally banned except under extremely narrow circumstances. *See* 18 U.S.C. § 922(o); Md. Code Ann., Crim. Law §§ 4-404, 4-405 (LexisNexis 2021) .

In most firearms "the difference between semiautomatic operation and automatic operation is controlled by" a component of the firearm called "the sear." *See* David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev. 45, 51–52 (2025). In semiautomatic firearms, "[t]he sear holds the hammer in a cocked position" allowing for only one bullet to be fired when the trigger is pressed. *Id.* However, "automatic sears," or "auto sears" for short, are sears that allow for automatic fire because the small device overrides the sear of a firearm. *See* Md. Code Ann.,

Crim. Law § 4-301(n) (LexisNexis Supp. 2024). Once the sear is overtaken, the striker can continue firing with just one trigger pull.[1]

Certain models of firearms, including some pistols, can be modified to accommodate auto sears to permit automatic fire. For that reason, such components are also known as "machine gun conversion devices," or in the case of certain pistols, "switches." ATF, *Machinegun Conversion Devices: Fact Sheet*, https://perma.cc/SV2G-GBSJ. Federal and Maryland law broadly prohibit possession of machinegun conversion devices like switches. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Justice, National Firearms Act Handbook app. B at 141-42 (April 2009), https://www.atf.gov/media/25096/download; Crim. Law §§ 4-301(m)(2), (n); 4-305.1.

**Certain Firearms with Cruciform Trigger Bars are Easily Convertible**

Certain pistols made by Austrian manufacturer Glock, and those with similar internal components, "are *uniquely easy* to convert with switches . . . because they use cross-shaped (or 'cruciform') trigger bars that provide surface area for a switch to contact." *Criminal Law – Firearm Crimes – Machine Gun Convertible Pistols: Hearing on S.B. 334 Before the Md. S. Jud. Proceedings Comm.*, 449th Sess. (Md. 2026) [hereinafter *S. Jud. Proceedings Comm. Hearing on S.B. 334*] (written testimony of Greg Lickenbrock, Senior Firearms Analyst for Everytown for Gun Safety, https://perma.cc/ZCH9-C3RJ (emphasis added)).[2] When a switch is installed on one of

[1] *See, e.g.,* Alain Stephens & Keegan Hamilton, *The Return of the Machinegun*, The Trace (March 24, 2022), https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/.

[2] *See also* Declaration of Lieutenant Colonel Matt Corell ¶ 5, attached as Exhibit 1 (explaining that "[i]nstallation of such a switch on these firearms can be accomplished in a matter of minutes by hand or by using common household tools").

these pistols, "[e]ach time the gun's slide returns forward, the switch hits the trigger bar [sear] and pushes it downward, causing the gun to fire," enabling automatic firing. *Id.*




*Illustration of Cruciform Trigger Bar. Id.*




*Top View Showing Switch Interference. Id.*

In fact, "[t]he only pistols compatible with switches are those that use [cruciform] trigger bars." *Id.* This is because other pistols made by manufacturers, like Smith & Wesson, Sig Sauer, and Springfield, feature "trigger bars [that] are broken into smaller, disparate components that are shielded from interference." *Id.* It is estimated that such pistols, which neither use a cruciform trigger bar nor are readily convertible, represent most models available for sale on the handgun market. *Id.*

When modified, these firearms facilitate rapid and continuous fire.[3] A modified Glock or similar pistol can reportedly fire up to 1,200 rounds per minute—a faster rate of fire than the standard M4 machine gun used by the United States military.[4] "What's more, the comparatively small size of the Glock pistol makes it 'more difficult to control, and therefore more dangerous

[3] *Garland v. Cargill and Machine Gun Conversion Devices*, 72 DOJ J. Fed. L. & Prac. 17, 27-29 (2024) (describing operation of a "Glock-type MCD").

[4] Press Release, U.S. Att'y's Off., N. Dist. of Texas, Fort Worth Manufacturer Charged in Glock Switch Case (Nov. 18, 2022), https://perma.cc/B35Z-4AXG.

[than a typical machinegun] once a Glock Switch is added.'" *United States v. Oxley*, No. CR DLB-23-213, 2025 WL 2306238, at *11 (D. Md. Aug. 8, 2025). As a consequence, use of a modified pistol allows the firing of "multiple bullets instantaneously," without adequate control, making it "more likely that innocent bystanders could be killed." *United States v. Brooks*, 100 F.4th 825, 840 (7th Cir. 2024).

**3D Printing Causes an Enormous Proliferation of Switches**

Until just a few years ago, switches were difficult to acquire because they had to be specially manufactured, and were often imported from overseas.[5] However, the proliferation of 3D printing caused a sea change in the manufacture and sale of switches.

Also known as additive manufacturing, 3D printing allows for the creation of physical objects from 3D computer models by adding material one layer at a time. *See* NIST, Additive Manufacturing, https://perma.cc/9ZJY-A72Q. Many 3D printers are designed and intended for personal use, and object designs are widely available online for free; it is accordingly "easy, fast, and cheap" to locate designs and "print" corresponding objects at home. *See* Tabrez Y. Ebrahim, *3D Printing: Digital Infringement & Digital Regulation*, 14 Nw. J. Tech. & Intell. Prop. 37, 41 (2016). The upshot is that 3D printers can now easily be "used to create dangerous firearm accessories" like switches. *See* Andrew Touma, *When the Second Amendment Meets the Third Dimension: Bruen in the Age of 3D-Printed Firearms*, 21 Duke J. Const. L. & Pub. Pol'y Sidebar 173, 175 (2026); *see also* Corell Decl. ¶ 6 ("While previously switches were often imported from

[5] *See* Brian New, *3D printers used to make illegal handgun switches magnifies challenges for law enforcement*, CBS News (January 10, 2023), https://www.cbsnews.com/texas/news/3d-printers-used-to-make-illegal-handgun-switches-magnifies-the-challenge-for-law-enforcement/ (noting that previously switches were "being manufactured overseas and sold online" but "[m]any are now made by the hundreds locally by inexpensive 3D printers in just minutes").

overseas, 3D printing has enabled individuals to produce switches locally, making them much more widely available.").

This combination of technological developments—(1) firearms uniquely easy to modify with a switch, and (2) the proliferation of 3D printing, enabling at-home manufacture of switches—has led to a staggering increase in the availability of switches. The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), for instance, has seen an "exponential rise" in the number of machinegun conversion devices recovered in crimes and subsequently traced by the agency, increasing from 658 in 2019 to 5,816 in 2023, a rise of more than 784%.[6] This rise is echoed in the findings of local law enforcement as well. For instance, in 2024, the "Chicago Police Department recovered 604 machine gun conversion devices—up from 81 in 2020," a rate of more than two per day.[7] That same year, Memphis police estimated that it recovered three switches a week.[8]

As a result, it is now sadly routine for law enforcement to encounter domestic criminal enterprises engaged in sale or re-sale of switches on the black market. *See, e.g., United States v. Hudson*, No. 24-5697, 2026 WL 674368, at *1 (6th Cir. Mar. 10, 2026) (discussing a "vertical distribution chain" to sell Glock switches, totaling "over 80 devices [made] with a 3D printer"); *United States v. Williams*, No. 25-4226, 2026 WL 2169099, at *1 (4th Cir. July 28, 2026) (noting that criminal defendant attempted to sell "ten firearms and three Glock switches"); *United States*

[6] ATF National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations Volume 4 pt. 5, at 7, https://www.atf.gov/sites/default/files2/nfcta_volume_iv_-_part_v_0.pdf.

[7] Press Release, ATF, *ATF, Chicago Police Dep't Announce Results of Enforcement Initiative*, (August 5, 2025), https://perma.cc/FW42-A4WM.

[8] Jay Jones, ABC 24, *How Often Do Memphis Police Find Glock Switches?*, (April 30, 2024), https://www.localmemphis.com/article/news/crime/how-often-memphis-police-find-glock-switches/522-66d7da4f-9fd5-4eec-a76c-eebdfa1bc5eb.

*v. Lausane*, No. 2:25-CR-253-RAH-KFP, 2025 WL 2946992, at *1 (M.D. Ala. Aug. 29, 2025) (noting criminal seizure of approximately 30 "Machine Gun Conversion Devices"). And the corresponding use of switch-equipped pistols by drug trafficking organizations constitutes a "significant and ongoing public safety threat in Baltimore." Corell Decl. ¶¶ 14-15.

In Maryland, firearm recoveries by state and local law enforcement involving at least one machinegun have skyrocketed, from a total of 30 in the four years between 2019 and 2022, to 292 between 2023 and 2026, an increase of 873%. *See* Declaration of Rosemary Chappell ¶ 7, attached as Exhibit 2. The overwhelming majority of machineguns in these recoveries "are pistols that feature cruciform trigger bars." *Id*. While the reporting of this state recovery data was not mandatory until 2023, *id.* ¶ 6, Maryland's criminal charging data similarly reflects an explosion of machineguns onto its streets. As recently as 2022, state criminal charges relating to machineguns were exceedingly rare, reflecting the then-effective and strict controls on the sale of automatic weapons. From 2019 through 2022, Maryland brought on average just 14 charges per year for all state crimes most linked to machineguns.[9] In the last few years, however, this number leapt by approximately 1,500%, hitting 202 charges in 2024, 278 in 2025, and 231 thus far in 2026.

The explosion of automatic weapons into American communities has been predictably devastating, leading to numerous mass casualty events.[10] For example, just last month, police

---

[9] This data combines Maryland District Court and Circuit Court charges each year for the following crimes: Crim. Law § 4-405(a) (use of a machinegun for an offensive purpose), § 4-305.1 (possession of rapid fire trigger activator), § 4-404 (use of machinegun in crime of violence). *See* Declaration of Kathleen Maher, attached as Exhibit 3.

[10] Additionally, since 2020, firearm-related injuries are the leading cause of death for children in the United States. *See* Bailey K. Roberts, et al., *Trends and Disparities in Firearm Deaths Among Children*, Pediatrics, Sept. 2023, at 2; Carolyn Raymond-King, M.D., Ph.D., et al., *Current Causes of Death Among Children and Adolescents in the United States*, Correspondence, N. Engl. J. Med. 2026; 394:1958-1959.

recovered a "Glock pistol modified with an auto sear" from the scene of a mass shooting at a Seattle food festival, which resulted in three deaths and at least five wounded, including a two-year old boy.[11] In 2024, a modified Glock pistol was used in a mass shooting during a Tuskegee University homecoming celebration, leaving one person killed and sixteen injured.[12] In 2023, the perpetrator of a mass shooting at Morgan State University in Baltimore used a pistol "modified with a Glock switch," wounding five individuals. *S. Jud. Proceedings Comm. Hearing on S.B. 334*, https://perma.cc/UC7C-TJQE (written statement of Erin Murphy, Esq., Chief of Staff & Government Affairs, Baltimore Police Department). As further tragic examples, two additional recent homicides in Baltimore involved the use of modified handguns—both victims suffered multiple gunshot wounds, and one victim was shot thirteen times. *See* Corell Decl. ¶ 13.

**The General Assembly Responds**

This year, in response to these tragedies and the growing public safety threat posed by easily convertible pistols and the ready availability of switches, Maryland considered legislation aimed at curbing the proliferation of such firearms in the State. Multiple witnesses, including representatives from several police departments in Maryland, testified to the Maryland Senate, following the introduction of SB 334, about the increased recoveries of machinegun convertible pistols, and the danger posed to the public. The President of the Baltimore City Council wrote that "Baltimore City has seen an influx of these illegally converted machine guns in recent years; the Baltimore Police Department (BPD) reported that recoveries nearly doubled between 2024 and

---

[11] The Guardian, *Seattle Police Recover Machine Gun and Ghost Gun from Scene of Mass Shooting*, July 28, 2026, https://www.theguardian.com/us-news/2026/jul/28/seattle-police-mass-shooting-guns.

[12] Carol Robinson, *Man Arrested in Tuskegee Shooting Admits Firing Gun with Glock Switch, Denies Shooting Anyone, Records State*, AL.COM (Nov. 19, 2024, 5:18 PM), https://www.al.com/news/2024/11/man-arrested-in-tuskegee-shooting-admits-firing-gunwith-glock-switch-denies-shooting-anyone-records-state.html.

2025." *S. Jud. Proceedings Comm. Hearing on S.B. 334* (written statement of Zeke Cohen, Baltimore City Council President's Office), https://perma.cc/FLW4-R7VZ.

A representative from the Montgomery County Police Department similarly testified that, in the past year, the department recovered 70% more machinegun convertible pistols than the year prior. *Id.* (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division). The Acting Police Chief of the Annapolis Police Department also spoke to express the department's strong support for the bill, listing shootings or shots-fired incidents involving switches to which the department had responded. *Id.* (oral testimony of Amy Miguez, Acting Chief of the Annapolis Police Department). Several witnesses also expressed profound concern over instances of gun violence in Maryland that had been perpetrated with switches. *Id.* (written statement of Erin Murphy, Esq., Chief of Staff & Government Affairs, Baltimore Police Department); *see also id.* (written statement of Tarria Stanley, Deputy Director of Legislative Advocacy, Community Justice, and Co-lead, Marylanders to Prevent Gun Violence), https://perma.cc/48FQ-SQ8P.

On May 26, 2026, Governor Moore signed SB 334. *See* 2026 Md. Laws Ch. 771, attached as Exhibit 4 (to be codified at Crim. Law §§ 4-301, 4-302, 4-305.2, 4-306). The law formally goes into effect on October 1, 2026, though its substantive provisions only become effective on January 1, 2027. *See* Exhibit 4 § 4-305.2(A) (effective date).

SB 334 prohibits the manufacture, sale, purchase, receipt, or transfer of a "machine gun convertible pistol" on or after January 1, 2027. *See id.* § 4-305.2(A). A "machine gun convertible pistol" is narrowly defined as a semiautomatic pistol with both (1) "a cruciform trigger bar" and (2) that "can be readily converted by hand or using common household tools into a machine gun by the installation or attachment of a pistol converter [switch] as a replacement for the slide's

backplate."[13] *Id.* § 4-301(o). Semi-automatic pistols that do not incorporate both of those design components are not subject to the law. *See, e.g.*, *id.* § 4-301(o)(3). As stated above, "roughly 75 to 80 percent of the pistol market would simply be untouched by this bill." *S. Jud. Proceedings Comm. Hearing on S.B. 334* (oral testimony of Greg Lickenbrock), https://perma.cc/ZCH9-C3RJ.

The law thus carefully "targets industry designs that make machine gun conversion possible in the first place." *Id.* (oral testimony of Sen. Sara N. Love). The goal of the legislation is "to strengthen product safety standards . . . [to] ensur[e] that no handgun sold to civilians [in Maryland] can be easily converted into a DIY machine gun." *S. Jud. Proceedings Comm. Hearing on S.B. 334* (written statement of Sen. N. Sara Love), https://perma.cc/M63V-5SDH.

**Procedural Background**

Two sets of Plaintiffs filed suit, challenging SB 334 on May 26 and July 2, 2026, respectively, each alleging a single count under the Second and Fourteenth Amendments. *See Duffy v. Moore*, No. 1:26-cv-2647 (D. Md.), ECF No. 1; *Bathras v. Moore*, No. 1:26-cv-2074 (D. Md.), ECF No. 1. Plaintiffs include individual firearm consumers, firearm instructors, gun stores, and firearm advocacy associations. The *Duffy* and *Bathras* Plaintiffs each filed a motion for preliminary injunction on July 13 and July 20, 2026, respectively. *Bathras*, ECF Nos. 21, 29. On July 23, 2026, this Court ordered that the cases be consolidated. *Bathras,* ECF No. 26.

## STANDARD OF REVIEW

A preliminary injunction is an "'extraordinary and drastic remedy,' 'that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Robinson v. National Collegiate Athletic Ass'n*, 172 F.4th 271, 285 (4th Cir. 2026). Accordingly, such injunctions

[13] The law defines "common household tool" to "include[] a screwdriver, a pipe wrench, pliers, a hacksaw, a crowbar, an electric drill, a rotary tool, a hammer, a chisel, a file, and a crescent wrench." 2026 Md. Laws Ch. 771 § 4-301(a)(H).

"should be 'granted only sparingly and in limited circumstances.'" *Id.* (citation omitted). To obtain such relief, Plaintiffs must show "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest." *Id.*

## ARGUMENT

### I. PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS.

Plaintiffs cannot demonstrate a likelihood of success on their sole legal claim, that SB 334 violates the Second Amendment. Courts follow a "two-part test" to "assess[] Second Amendment challenges." *Kipke v. Moore*, 165 F.4th 194, 206 (4th Cir. 2026). At Step One, a court evaluates whether the "Second Amendment's plain text" covers the regulation at issue, and if so, at Step Two the court determines whether "a firearm regulation is *consistent* with this Nation's historical tradition." *Id.* (citation omitted). Plaintiffs' claim fails at both steps.

#### A. Plaintiffs' Facial Challenge is Unlikely to Succeed.

Both sets of Plaintiffs appear to bring solely a facial challenge to SB 334. While both Complaints briefly reference "as-applied" challenges in addition to facial challenges, *Duffy* Compl. ¶ 62, *Bathras* Am. Compl. at 15, neither motion before the Court references any as-applied challenge as to any particular Plaintiff or firearm. *Accord Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 294 (M.D.N.C. 2015) ("[A]n as-applied challenge attacks the constitutionality of a statute 'based on a developed factual record and the application of a statute to a specific person.'") (citation omitted). Further, both motions seek a broad preliminary injunction of SB 334 in its entirety. *See* ECF No. 21-1, at 4 ("Plaintiffs challenge Maryland's ban in its entirety as to *all* handguns with a cruciform trigger bar.") (emphasis in original); *cf. Doe v. Jaddou*, No. CV TDC-24-0650, 2024 WL 2057144, at *10 (D. Md. May 8, 2024) (explaining that an as-applied challenge "does not seek relief that would require the Court to 'reach beyond the

particular circumstances of' [Plaintiff's] case"). Accordingly, Plaintiffs bring only a facial challenge to SB 334.

As the Fourth Circuit explained in rejecting a similarly broad challenge to Maryland's assault weapons ban, "facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (en banc) (citation omitted). Such a challenge is "the most difficult . . . to mount successfully" since Plaintiffs must "establish 'that no set of circumstances exists under which the statute at issue would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *Id*. (brackets removed, citation omitted). Plaintiffs fail to carry this heavy burden.

Plaintiffs' facial challenge rests on just the type of speculation the Fourth Circuit warned about. The *Duffy* Plaintiffs delineate between, on the one hand, Glock "Gen 3, Gen 4, and Gen 5 pistols, and Glock clone pistols" which they concede "could be fitted with a 'switch' or 'auto-sear,'" as contrasted against "Gen 6" and "V" series Glock firearms, which, they claim, "are designed to prevent . . . the installation of existing 'switches.'" ECF No. 29-1, at 11. The Maryland Handgun Roster Board has not yet promulgated regulations concerning which handgun models will be subject to SB 334, and Plaintiffs do not claim that regulation of some unknown subset of handguns will cause them constitutional injury. Accordingly, "[i]n the context of a facial challenge" any "fear" about SB 334's application is "speculative at best." *Brown v. Gilmore*, 258 F.3d 265, 278 (4th Cir. 2001).

Because Plaintiffs make no attempt to demonstrate that "no set of circumstances exists" under which SB 334 would be valid, they are unlikely to succeed on their facial challenge to SB 334.

### B. The Second Amendment Does Not Protect a Right to Easily Convertible Firearms.

Under the analysis outlined in *New York State Rifle & Pistol Association v. Bruen*, Plaintiffs' claims are unlikely to succeed. 597 U.S. 1 (2022). In that case, the Supreme Court established a two-step process for evaluating Second Amendment claims. At Step One of the *Bruen* analysis, the court must assess whether the "Second Amendment's plain text covers an individual's conduct[.]" *Id.* at 17. If so, the Court proceeds to Step Two, and evaluates whether the government has shown that "a firearm regulation is consistent with this Nation's historical tradition[.]" *Id.*

Starting at Step One, "a court first looks to the text of the Second Amendment to see if it encompasses the desired conduct at issue. If the text does not extend to the desired conduct, that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Bianchi*, 111 F.4th at 445-46. In other words, if the plain text of the Second Amendment does not encompass the conduct regulated by the law at issue, "the Second Amendment does not apply." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc) (citation omitted).

SB 334 does not fall within the ambit of the Second Amendment for at least two reasons: (1) the law imposes permissible conditions on the commercial sale of arms, and (2) pistols that are easily convertible to machineguns are excessively dangerous weapons not covered by the Second Amendment.

First, the Supreme Court has repeatedly emphasized that the Second Amendment does not preclude "laws imposing conditions and qualifications on the commercial sale of arms." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *see also B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) ("[C]ommercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test."). Accordingly, legislatures

have broad latitude to impose conditions on the sale of arms to prevent firearms from being criminally misused. For instance, the Second Amendment does not bar a myriad of qualifications on firearm purchasers, such as background checks requiring "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Bruen*, 597 at 80 (Kavanaugh, J., concurring). By the same token, States may require gun stores to sell only firearms that have met prescribed "manufacturing standards and safety features," when such regulations do not "meaningfully constrain" the core "possessory right" of the Second Amendment. *See Granata v. Campbell*, 798 F. Supp. 3d 46, 57 (D. Mass. 2025) (holding that Second Amendment did not cover state "handgun regulatory scheme"). That is the case here.

SB 334 supplements Maryland's handgun regulatory scheme, prohibiting the sale of the small number of handgun models that both (1) incorporate a cruciform trigger bar and (2) are easily convertible to machineguns.[14] Plaintiffs have not demonstrated that SB 334 somehow interferes with their core possessory right to obtain arms for self-defense. It is undisputed that to the extent certain Plaintiffs already possess pistols subject to SB 334, they may keep them; in fact, none of the Plaintiffs claim that they do not already own one or more of the pistols potentially regulated by SB 334. While it is speculative to predict which pistol models will be prohibited from sale, it is highly likely that most of the handgun market will remain unaffected by SB 334 and thus will be available to Plaintiffs to purchase. *S. Jud. Proceedings Comm. Hearing on S.B. 334* (oral testimony of Greg Lickenbrock), https://perma.cc/ZCH9-C3RJ. Plaintiffs fail to demonstrate how

[14] Maryland's Handgun Roster board is already required to consider nine criteria in determining potential inclusion on the state handgun roster, which permits sale of a given pistol model. *See* Md. Code Regs. § 29.03.03.10(A)(1)-(9) (requiring consideration of concealability, accuracy, qualify of manufacture, reliability as to safety, detectability, and utility, among other factors); Md. Code Ann., Pub. Safety § 5-405(b) (LexisNexis 2022) (same).

the commercial regulation of a small number of pistols meaningfully interferes with their right of armed self-defense. *See Granata*, 798 F. Supp. 3d at 56 (explaining that this "meaningful constraint" analysis has been adopted by the Second, Fifth, Ninth, and Tenth Circuits); *see also Bianchi*, 111 F. 4th at 441-42 (explaining that regulation of "excessively dangerous weapons" is permitted when "preserving avenues for armed self-defense"). For this reason alone, Plaintiffs' argument fails at Step One of *Bruen*.

Second, Maryland's regulation of machinegun convertible pistols does not concern "arms" within the meaning of the Second Amendment. The Supreme Court has held that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Historically, "the right was not a right to keep and carry any weapon whatsoever[.]" *Id.* at 626; *see also Wolford v. Lopez*, 146 S. Ct. 2032, 2042 (2026) (same). Dangerous and unusual weapons can "be banned without infringing upon the right to bear arms" because "[s]uch excessively dangerous arms" are not reasonably related to the right to self-defense protected by the Second Amendment. *Bianchi*, 111 F.4th at 450.

In *Bianchi*, the Fourth Circuit affirmed that Maryland could ban dangerous and unusual weapons without violating the Second Amendment. *Id.* at 441-42 (upholding Maryland's Firearms Safety Act of 2013 as "another example of a state regulating excessively dangerous weapons once their incompatibility with a lawful and safe society becomes apparent, while nonetheless preserving avenues for armed self-defense"). In particular, the court noted that "military-grade or gangster-style weapons" are the paradigmatic examples of weapons that are so excessively dangerous that they are outside the scope of the Second Amendment. *Id.* at 452. The *Bianchi* court determined that assault-style weapons—including the AR-15, a semiautomatic rifle—were not within the scope of the Second Amendment. *Id.* at 441. And the court found the AR-15 ill-

suited for self-defense and thus outside the Second Amendment's protection in part because of its capacity to fire a "rapid and uninterrupted discharge of many shots." *Id.* at 458-59. The Court also noted the unique "modifiability" of AR-15s, as such firearms can often incorporate "combat-functional" attachments such as a "flash suppressor, recoil compensator, or silencer," along with "sights, scopes, slings," and "bayonets," among others. *Id.* at 455.

The machinegun convertible pistols covered by SB 334 are dangerous and unusual—and outside the ambit of the Second Amendment—for similar reasons to those discussed in *Bianchi*. *See id.* at 451. Machinegun convertible pistols can be easily modified into automatic firearms—with no special expertise, tools, or expense necessary for the conversion of these pistols into fully automatic weapons.[15] This minimal effort turns an otherwise small and concealable pistol "into a weapon of mass violence." *S. Jud. Proceedings Comm. Hearing on S.B. 334* (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division). In addition, a converted pistol is notoriously "more difficult to control" because the pistol itself is not designed to function as an automatic weapon with such a high rate of fire. *Oxley*, 2025 WL 2306238, at *11; *see also* Corell Decl. ¶ 7 ("The continuous recoil caused by automatic fire in these modified pistols makes it extremely difficult to fire them with accuracy," creating a "higher risk to injure or kill innocent bystanders"). Machinegun convertible pistols thus "dramatically increase the lethality of shootings, endanger law enforcement, and put innocent lives

[15] Dan Snyder, *ATF officers in Philadelphia Say They're Seeing More Switches to Make Guns Fully Automatic: "Keeps me up at night,"* CBS News, (May 15, 2025), https://www.cbsnews.com/philadelphia/news/glock-switch-automatic-weapons-philadelphia-atf/ (quoting ATF special agent saying "[i]t takes less than 30 seconds to pop that [switch] on . . . . You don't need any special tools to do it. You can actually just use a pen"); *see also WLOS News 13, Experts explain Glock switches, at 1:08* (YouTube, July 27, 2026), https://www.youtube.com/watch?v=lG_mx-ks8v8 (demonstrating how the back plate of a pistol may be removed and a switch inserted).

in risk." *S. Jud. Proceedings Comm. Hearing on S.B. 334* (oral testimony of John O'Brien, Director of the Montgomery County Police Department Special Investigations Division).

Plaintiffs argue that machinegun convertible pistols cannot be dangerous and unusual because they are "in common use." *See* ECF No. 21, at 10. But the Fourth Circuit has rejected the argument that "so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited." *See Bianchi*, 111 F.4th at 459-60. Under binding Fourth Circuit precedent, the popularity of a firearm cannot render it immune from regulation. Thus, machinegun convertible pistols are dangerous and unusual weapons that are outside the Second Amendment's protection.

### C. Regulation of Easily Convertible Firearms Fits Easily into the Historical Tradition of Arms Laws.

Even if the Court were to proceed to Step Two of the *Bruen* analysis, Plaintiffs' claim would fare no better. That is, the regulation of handguns with cruciform trigger bars, which are readily convertible to machineguns, follows neatly in the tradition of regulating dangerous weapons and components especially susceptible to criminal misuse.

The Supreme Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (emphasis added). The Second Amendment does not represent "a law trapped in amber," instead applying both beyond "arms that were in existence at the founding" and "[b]y that same logic . . . to more than just those regulations identical to ones that could be found in 1791." *Id.*; *see also United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) ("That there were no serial numbers during the Founding Era is a distinction without a difference."). And while the historical analysis generally starts with analogues from the founding, "we look beyond the Founding Era to determine

whether our national tradition of firearm regulation supports a government's restriction today." *Kipke v. Moore*, 165 F.4th at 207.[16]

*1. Historical Analysis of SB 334 Should be Nuanced.*

*Bruen* recognized that where a law implicates "unprecedented societal concerns or dramatic technological changes," courts should take an even "more nuanced approach" to the historical inquiry. 597 U.S. at 26. This case calls for just such a nuanced approach, as SB 334 addresses "*both* unprecedented societal concerns *and* dramatic technological changes." *Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025) (emphasis in original).

The need for SB 334 was spurred by two technological leaps that would have been unthinkable to the founders, namely machineguns and 3D printing of firearm parts enabling automatic fire.

The advent of machineguns in the early 20th century represented a profound break with past firearm design and use. Indeed, well into the 19th century, "firearms were essentially what they had been in 1430" where "[a]fter every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile . . . then ignite the gunpowder and send the projectile on its way." Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 71–72 (2023). The 1920s saw the first widely-available "practical" and "hand-held" fully-automatic firearm, which could fire bullets

[16] Plaintiffs err in suggesting that SB 334 inherently fails Step Two because handguns are in common use. ECF No. 21, at 10-11. The Fourth Circuit has explained that any consideration of a weapon's "common use" occurs at Step One, and at "step two, our job is different," determining whether "a firearm regulation is consistent with this Nation's historical tradition." *See Kipke*, 165 F.4th at 206; *see also Bianchi*, 111 F.4th at 460 (rejecting notion that "a weapon's common use is conclusive evidence that it cannot be banned"). And contrary to Plaintiffs' argument, ECF No. 21, at 11, the Supreme Court's decision in *Heller* did not hold "that any ban whose scope includes any handguns at all is unconstitutional." *See Capen v. Campbell*, 134 F.4th 660, 674 (1st Cir. 2025).

continuously from a single trigger pull, the Thompson submachine gun. *Id*. at 63-64. The rapid adoption of "Tommy-guns" and similar machineguns by gangsters, and a corresponding rise of violent crime, led directly to the National Firearms Act, which imposed onerous taxes on machineguns, "explicitly intended to tax these weapons out of existence." *Mock v. Garland*, 75 F.4th 563, 569 (5th Cir. 2023). Then, in 1986, Congress amended the Gun Control Act to criminalize the possession of a machinegun not previously registered, effectively freezing all private ownership of machineguns. *See* 18 U.S.C. § 922(o).

Despite these strict restrictions on machineguns, criminals have again gained ready access to guns with automatic fire due to the second technological development at issue here: 3D printing. The Supreme Court recently recognized "profound changes in how guns are made and sold[,]" noting that prior technological barriers to manufacture and modification of firearms have nearly vanished "[w]ith the introduction of new technologies like 3D printing and reinforced polymers." *See Bondi v. VanDerStok*, 604 U.S. 458, 463 (2025). As noted above, the 3D printing process enables the manufacture of "dangerous firearm accessories" such as "machine gun conversion devices," in one's home, for minimal cost, in a matter of minutes. Touma, 21 Duke J. Const. L. & Pub. Pol'y Sidebar at 175.[17] As one scholar described the impact of 3D printing on firearms manufacture, "[n]othing like that has ever existed before in American life." Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal. L. Rev. 1, 70-71 (2025).

---

[17] *See also* Miguel Torres, *3D printing makes dangerous 'Glock switch' devices easier to get, ATF says*, Arizona Republic (October 4, 2024), https://www.yahoo.com/news/3d-printing-makes-dangerous-glock-223120344.html (ATF Special Agent explained that "[d]epending on your 3D printer's speed, it takes an average of 40 minutes to print one of these machine gun conversion devices").

These "dramatic technological changes,"—first the development of automatic-firing machineguns, and second the 3D printing of firearm components designed to circumvent laws prohibiting machineguns—have in turn given rise to "unprecedented societal concerns," in this case the use of modified handguns to facilitate mass violence. *See, e.g., Bianchi*, 111 F.4th at 463 ("Rapid advancements in gun technology are a central cause of this mass carnage."); *Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024) (explaining that "firearms did not have the capacity to occasion a societal concern with mass shootings or other widespread homicidal criminality until dramatic technological changes vastly increased their capacity and the rapidity of firing"); *see also United States v. Harrison*, No. CR 25-00187 (EGS), 2025 WL 2144077, at *6 (D.D.C. July 28, 2025) (discussing firearm "fitted with [an] auto-sear device with the potential to inflict a tremendous amount of harm").

Under an appropriately nuanced analysis, SB 334 is permitted under the Second Amendment because legislatures may address "unprecedentedly lethal criminal activity by restricting or banning weapons that are particularly susceptible to, and [are] widely used for, multiple homicides and mass injuries." *Hanson*, 120 at 240. As the Fourth Circuit explained, such a regulation fits within the "definable arc of technological innovation and corresponding arms regulation" in American history. *Bianchi*, 111 F.4th at 471.

*2. Restrictions on Armed Groups.*

The continually-evolving arc of innovation and regulation began in the colonial era and, as explained below, continues to present day. Throughout our history, legislatures consistently banned and otherwise restricted "excessively dangerous weapons" and other grave threats to public safety of the time, "while nonetheless preserving avenues for armed self-defense." *Id.* at 442. Over time these public safety threats evolved from masses of individuals and quantities of

gunpowder, to specific weapons uniquely susceptible to criminal misuse and specific firearm components.

"[W]hen the Second and Fourteenth Amendments were ratified mass killings were a group activity, relying on primitive firearms and melee weapons . . . because individuals lacked the means to inflict mass casualties on their own." *Barnett v. Raoul*, 180 F.4th 1035, 1057 (7th Cir. 2026) (cleaned up and citations omitted). It is therefore unsurprising that some of the first American arms restrictions came in the form of suppressing the formation of armed groups, rather than regulating particular arms.

In response to the risk of violence caused by armed groups, "[t]he American Colonies and United States followed English common law by treating armed groups as riots or unlawful assemblies." Mark Anthony Frassetto, *Mass Violence and the Second Amendment: Analogizing Historical Prohibitions on Armed Groups to Modern Prohibitions on Assault Weapons and Large-Capacity Magazines*, 76 Ala. L. Rev. 43, 54–55 (2024). Numerous colonies and early states codified these prohibitions. For instance, Massachusetts passed a law in the 1750s banning the assembling of groups of three or more people armed with "any kind of weapons" or with any disguise. *Id*. Similar laws were passed in New Hampshire in 1791, New Jersey in 1797, and Maine, Rhode Island, Michigan, and Wisconsin, enacted similar bans in the early nineteenth century. *Id*.[18]

"[W]hereas the firepower needed to carry out a mass killing used to come from an aggregation of people," that same violence is now threatened by a single individual with a handgun

[18] The cited state laws include: An Act for Further Preventing All Riotous, Tumultuous, and Disorderly Assemblies, Mass. Acts, 380 (Law Passed 1752); Act of Feb. 16, 1791, ch. 87, 1791 N.H. Laws 718; Act of Feb. 24, 1797, ch. 637, 1797 N.J. Laws 179; 1838-39 Wis. Sess. Laws 368, 368; Me. Stat. tit. 12, ch. 159, § 5 (1840); 1846 Mich. Pub. Acts. 679, 679; 1857 R.I. Acts & Resolves 532, 533.

that can be easily modified to permit automatic fire. *See Barnett*, 180 F.4th at 1057. This is "a problem for which the historical solution is self-evidently unfit." *Id*. But just as its founding-era counterparts enacted preventative measures to prevent mass violence by banning assembly of armed groups of individuals, Maryland may properly prohibit the sale of certain easily convertible firearms to guard against the same harm.

*3. Restrictions on Gunpowder.*

Another early American restriction on the use of arms came in the form of laws concerning the storage and use of gunpowder. That is, "[a]ggregation of gunpowder concerned colonists as large amounts of the substance 'could kill many people at once if ignited.'" *Bianchi*, 111 F.4th at 464–65 (citation omitted). Colonial and early state governments limited the quantity of gunpowder that a person could possess or store in a single container. *See, e.g., Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024) (citing 1784 N.Y. Laws 627, a 1784 New York law limiting individuals to 28 pounds of gunpowder apiece, which they were required to separate into four different canisters). Legislatures also adopted diverse approaches such as establishing a limit on the number of pounds of gunpowder a person could keep in a single location, prohibiting "taking a firearm loaded with gunpowder into any house or building," or "requiring that gunpowder be stored in certain containers or on the highest story of the home." *Duncan*, 133 F.4th at 875; *see also Bianchi*, 111 F. 4th at 465 n.3 (collecting gunpowder laws).

Such regulations "established an early tradition of laws seeking to protect innocent persons from infrequent but devastating harm by regulating a component necessary to the firing of a firearm." *Duncan*, 133 F.4th at 876. Where, in the founding era, that threat came from an accumulation of gunpowder, today public safety is similarly threatened by the use of cruciform trigger bars in pistols that are easily convertible to machineguns. The Second Amendment permits legislatures to respond with preventative measures guarding against both such dangers.

*4. Restrictions on Bowie Knives.*

Moving forward through the "call and response" of arms innovation and corresponding regulation, *Bianchi*, 111 F. 4th at 462, in the nineteenth century American legislatures confronted a significant advancement in arms technology, which created a disproportionate danger to the citizenry: Bowie knives. So-named because of their association with Jim Bowie's 1827 "Sandbar Fight," which led to "two deaths and multiple non-fatal casualties," such knives and similar weapons "were designed 'expressly for fighting,' with longer blades, crossguards to protect fighters' hands, and clip points to facilitate cutting or stabbing adversaries." *National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 243 (2d Cir. 2025). These knives were "widely carried by Americans of all stripes . . . [were] 'widely popular in the North and South' during the Civil War," and both "suitable for" and "typically possessed for self-defense." *Barnett*, 180 F.4th at 1047-48 (alterations in original, citation omitted).

While seemingly quaint or antiquated today, the large-bladed Bowie knife was feared during the 19th century as "an instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859). Despite their general popularity, Bowie knives and similar bladed weapons were particularly "liable to criminal misuse" constituting "an alarming proportion of the era's murders and serious assaults," leaving "bloody and gruesome injuries" in their wake. *Lamont*, 153 F.4th at 243 (quotation marks omitted).

As a result, multiple jurisdictions banned the sale of Bowie knives, while others imposed burdensome taxes that amounted to an effective ban.[19] Other legislatures banned the carrying of

[19] *See* 1838 Tenn. Pub. Acts 200 (banning sale); 1881 Ark. Acts 192 (same); 1837 Ala. Laws 7 ($100 tax per sale, amounting to several thousand dollars today); 1838 Fla. Terr. Laws 36 ($200 per year tax on Bowie-knife sellers and $10 per year on Bowie-knife carriers).

Bowie knives entirely or with narrow exceptions.[20] Finally, several states prohibited the concealed carry of such knives, often among other weapons.[21] In sum, by the end of the nineteenth century, 49 states and the District of Columbia had enacted bans, taxes, restrictions, or other penalties associated with Bowie knives. *See* Spitzer, 51 Fordham Urb. L.J. at 93-94.

American legislatures accordingly held ample authority under the Constitution to impose heavy restrictions on the sale, carrying, and use of Bowie knives. To the extent that some states enacted more narrow restrictions on Bowie knives, such as bans on concealed carry, modern legislatures are not "limited to precisely the same restrictions when addressing new technology that enables a new, more devastating type of societal harm." *Duncan*, 133 F.4th at 881. Such analogues therefore provide a direct historical exemplar supporting Maryland's ban of easily convertible pistols with cruciform trigger bars, given their unique propensity for criminal misuse and heightened risks to public safety.

*5. Restrictions on Blunt-Force Weapons.*

During the same timeframe of arms regulation, American jurisdictions strictly limited multiple blunt-force weapons that were widely used when "early guns proved unreliable." *Bevis v. City of Naperville,* 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023). Start with slungshots. Created in the mid-19th century, slungshots were handheld weapons "with a weighted object at the end of a flexible strap." *Duncan*, 133 F. 4th at 876. They could be "held in a closed hand" while ready to "lash out" in close quarters. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans*

---

[20] *See* 1871 Tex. Laws 1st Sess. 25 (ban on all carry absent "reasonable grounds" to fear an attack); 1881 Ark. Acts 191 (ban on all carry); 1889 Ariz. Sess. Laws 30 (ban on all carry with narrow exceptions).

[21] *See* 1838 Va. Acts 76 (banning concealed carry of Bowie knives); 1838 Tenn. Pub. Acts 200 (same); 1839 Ala. Acts 67 (same); 1878 Miss. Laws 175 (same); 1879 N.C. Sess. Laws 231 (same); *see also* 1820 Ind. Acts 39 (barring concealed carry of "dirk" knives); 1880 S.C. Acts 448 (same).

*on Types of Arms Before 1900*, 50 J. Legis. 223, 345 (2024). Their concealability made slungshots "popular with criminals . . . but they were also carried at least sometimes by the law-abiding." *Id.*

Given their criminal popularity and association with harm to the citizenry, numerous states reacted decisively. From the middle to the end of the nineteenth century, seven states and two territories banned sales and manufacture of slungshots, while several states and territories also broadly banned the carrying of such weapons. *Id.* at 346.[22]

To take another example, in the latter nineteenth and early twentieth centuries, American legislatures also severely restricted access to and carry of blackjacks, a weapon with a "coil spring body with cylindrical shaped head," which was broadly favored by police for "100 years." *See id.* at 357. Due to their compactness and concealability, blackjacks also gained the "reputation of being a characteristic weapon of urban gangsters and rowdies." *People v. Brown*, 253 Mich. 537, 542 (1931). In response, New York, New Jersey, Oregon, and California banned the sale, manufacture, or carrying of blackjacks.[23] Several other jurisdictions prohibited their concealed carry or authorized further regulation of the weapons.[24]

---

[22] Cited laws include: Act of Apr. 7, 1849, ch. 278, § 1, 1849 N.Y. Laws 403, 403 (banning manufacture and sale); Act of Nov. 12, 1849, No. 36, 1849 Vt. Acts & Resolves 26, 26 (same); Act of Apr. 15, 1850, ch. 194, § 2, 1850 Mass. Acts 401, 401 (same); Act of Mar. 10, 1856, ch. 636, 1855-1856 Ky. Acts 96, 96-97 (1856) (ban on sale); Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 71, 71 (same); Act of June 2, 1893, ch. 4125, § 3, 1893 Fla. Laws 51, 52 (ban on manufacture and sale).

[23] *See* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442, 442 (banning manufacture and sale); Act of Mar. 28, 1912, ch. 225, §§ 1-1, 1912 N.J. Laws 364, 364-65 (same); Act of May 4, 1917, ch. 145 §§ 1-2, 1917 Cal. Stat. 221, 221 (same); Act of Feb. 21, 1917, ch. 377 §§ 2-3, 1917 Or. Laws 804, 804 (same and banning concealed carry); *see also* Kopel & Greenlee, 50 J. Legis. at 358 (collecting laws).

[24] *See also, e.g.,* Act of July 13, 1892, ch. 159, 27 Stat. 116–17 (1892) (prohibiting concealed carry); Act of Mar. 28, 1891, No. 257, § 1, tit. 11, § 15, 1891 Mich. Pub. Acts 388, 409 (criminalizing carry); Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144 (prohibiting concealed carry); An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 10, 1922 Mass. Acts, 560, 564 (prohibiting the manufacture and sale). The cited laws from Michigan

The extensive and varied restrictions on slungshots and blackjacks, some of the most dangerous weapons of the nineteenth century, are yet more examples in "a storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately." *Bianchi*, 111 F. 4th at 462. The challenged law here, SB 334, "is but another example of this constructive, indeed indispensable, dialogue." *Id.*

### *6. Restrictions on Machineguns, Short-Barreled Rifles, and Short-Barreled Shotguns.*

As firearm technology advanced into the early twentieth century, guns firmly surpassed blunt and bladed weapons in their potential for violence, and legislatures followed the now-established tradition of banning or otherwise tightly restricting especially dangerous weapons susceptible to criminal use, while preserving the individual right of self-defense. These laws often restricted the sale of guns with certain components, such as auto sears or shortened barrels, as these components created a disproportionate risk to public safety.

As early as the founding, legislatures enacted requirements on barrel length for militia members, to ensure that their weapons would be safe and appropriate for use in contributing "to the common defense." *See United States v. Miller*, 307 U.S. 174, 178 (1939) (citing founding-era laws). Centuries later, firearms with shortened barrels such as sawed-off shotguns, "became popular with the 'mass shooters of their day' -- notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *Ocean State Tactical*, 95 F.4th at 47. So too, short-barreled rifles emerged as a threat to public safety, because their "concealability coupled with [their] 'heightened capability to cause damage' ma[de] the weapon more appealing to those who intend to wield the

---

use the term "billie" or "pocket-billie" to refer to blackjacks. *See* Kopel & Greenlee, 50 J. Legis. at 358 ("[T]he words billie and billet were used for saps and blackjacks in particular from the late nineteenth century to early in the 20th century.") (quotation marks omitted).

firearm for unlawful use." *United States v. Rush*, 130 F.4th 633, 643 (7th Cir. 2025) (citation omitted).

Machineguns followed a similar trajectory. Specifically, Thompson machineguns and similar automatic weapons were adopted by criminals in the 1920s and 1930s, providing "access to weapons with firepower not seen before in civilian life." *Bianchi,* 111 F. 4th at 469. These weapons "exacted a devastating toll and garnered extensive national attention," through repeated incidents of mass violence. *Id*. (recounting the St. Valentine's Day Massacre and the Kansas City Massacre).

"Once again, legislatures responded" to each of these new firearm threats, as "[a]t least 29 states enacted anti-machine-gun laws between 1925 and 1934." *Id*. at 470 (collecting laws). And many states banned or otherwise restricted sawed-off shotguns and similar weapons. *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 67 (2017). This effort culminated in the National Firearms Act of 1934, with its "then-prohibitive $200 tax on the transfer or manufacture of machine guns, [and] short-barreled shotguns and rifles[.]" Catherine Camp, *Gun Regulation Exceptionalism and Adolescent Violence: A Comparison to Tobacco*, 48 J.L. Med. & Ethics 25, 28 (2020). And finally in 1986, Congress enacted what was effectively a broad proscription on new private ownership of machineguns. *See* Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986); *see also United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995) (quoting the sponsor of the provision as stating "I do not know why anyone would object to the banning of machine guns").

The Supreme Court and lower courts have uniformly held that these regulations on firearm components, namely taxing or barring the sale of firearms with shortened barrels or with components designed to permit automatic fire, are consistent with the Second Amendment. *See*

*Miller*, 307 U.S. at 180 (short barreled shotguns); *Heller*, 554 U.S. at 624 (explaining that it would be "startling" to suggest that the Second Amendment protects use of machineguns); *see also Oxley*, 2025 WL 2306238, at *12 ("The Second Amendment does not guarantee a right to possess machineguns, including a switch-equipped Glock pistol."); *United States v. Fisher*, No. 1:23-CR-00045-MR-WCM, 2024 WL 589115, at *3 (W.D.N.C. Feb. 13, 2024) ("[M]achineguns, and therefore machinegun conversion kits, are 'dangerous and unusual weapons' that fall outside the protection of the Second Amendment.") (citation omitted); *United States v. Mitchell*, 734 F. Supp. 3d 702, 709-10 (N.D. Ohio 2024) (noting that "district courts have uniformly rejected constitutional challenges . . . in cases involving possession of glock switches or similar conversion devices" and collecting cases).

SB 334 regulates the sale of specific firearm components that pose a heightened risk to public safety. Maryland's law accordingly follows the tradition of tightly regulating firearms with specific, dangerous components, and represents the State's attempt to prevent circumvention of these nearly century-old laws.[25]

*7. Modern Regulation of Machineguns.*

Following the arc of arms innovation into the modern era, prohibiting automatic firearms has posed a continuing regulatory challenge under the National Firearms Act, as certain semiautomatic gun models for the civilian market are adapted from military versions designed for automatic fire, and still other semiautomatic firearms permit automatic fire with minimal changes to relevant components.

---

[25] Much like background checks, which effectuate prohibitions on receipt of firearms by felons, for instance, SB 334 seeks to ensure that individuals cannot obtain prohibited machineguns. *See United States v. Duarte*, 137 F.4th 743, 751 (9th Cir. 2025) (recounting how "background checks" are required "for the very purpose of ensuring that [firearm] licenses are not issued to felons").

Contrary to Plaintiffs' claim that "federal law has always recognized that the line to become a 'machinegun' lies at *actual* automatic action, not potential conversion to automatic action," ECF No. 21-1 at 16 (emphasis in original), both federal law and the ATF have recognized that firearms may constitute prohibited machineguns under the National Firearms Act if they are susceptible to automatic fire via basic modifications to internal components, or if they can be "restored" to automatic fire capability in a matter of hours.[26]

ATF has issued multiple administrative rulings that speak to this precise issue. For instance, in ATF Rulings 82-2 and 82-8, the agency examined multiple firearms including the KG-9, SM-10, and SM11A1 pistols.[27] For each of these guns, ATF noted that their components included a "disconnector" and/or a "trip" which "prevents more than one shot being fired with a single function of the trigger. *See* Exhibit 5 at 142-44. However, for all of these firearms, the components were designed in such a way that "simple modification to them, such as cutting, filing, or grinding, allows the firearms to operate automatically." *Id.* at 143. Accordingly, ATF concluded that such firearms were properly classified as machineguns given their capability for "full automatic fire by simple modification or elimination of existing component parts." *Id.* at 143-44; *see also United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 688 n.2 (9th Cir. 2006) (citing these "longstanding ATF rulings").

---

[26] The National Firearms Act defines machineguns as, in part, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," and "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

[27] Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Justice, National Firearms Act Handbook app. B at 142–44 (April 2009), https://www.atf.gov/media/25096/download, excerpt attached as Exhibit 5.

By the same token, for manufactured machineguns, even if they are later modified to permit only semiautomatic firing, such firearms retain their status as machineguns under the National Firearms Act if they can be "readily restored" to automatic fire. *See United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422–23 (6th Cir. 2006) (holding that rifle constituted machinegun where it could be converted to fire automatically in six hours); *TRW Rifle 7.62X51mm Caliber*, 447 F.3d at 692 (two hours).

As these examples demonstrate, federal law and regulations guard against circumvention of the general prohibition on machineguns by prohibiting certain firearms that can be easily modified or restored to permit automatic fire. While SB 334 does not categorize readily convertible handguns with cruciform trigger bars as machineguns, the law recognizes that 3D printing and the vulnerable design of certain handguns renders them easily convertible to machineguns in a matter of moments. The recent history of machinegun regulation underscores that heightened restrictions may be properly applied to firearms where their easy modification poses disproportionate risks to public safety.

* * *

Under a properly nuanced view of the mountain of historical restrictions recounted above, dating from colonial times to the present day, the Second Amendment permits banning the sale of machinegun convertible pistols as such weapons are highly susceptible to criminal misuse and mass violence. SB 334 is therefore "fully consistent with our nation's long and dynamic tradition of regulating excessively dangerous weapons whose demonstrable threat to public safety led legislatures to heed their constituents' calls for help." *Bianchi*, 111 F. 4th at 472; *see also Duncan*, 133 F.4th at 860 (finding historical tradition "of protecting innocent persons by . . . by regulating

components of a firearm that are necessary to the firing of a firearm"). Plaintiffs are therefore unlikely to demonstrate that SB 334 violates the Second Amendment.

## II. PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM.

Plaintiffs also fail to demonstrate irreparable harm, which is independently fatal to their request for injunctive relief. Plaintiffs here fall into one of four categories: consumers, instructors, gun stores, and associations. None can make a "clear showing of irreparable harm" that is "actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (citation omitted).

Both sets of Plaintiffs rely heavily on their argument that they will incur irreparable harm through the violation of their constitutional rights. However, for the reasons set forth above, they have failed to demonstrate a likelihood of success on their sole constitutional claim, precluding the finding of irreparable harm on this ground as well. *See Kipke v. Moore*, 695 F. Supp. 3d 638, 662 (D. Md. 2023) (explaining that "the likelihood of irreparable harm necessarily depends on the likelihood of success on the merits of the claim"). However, Plaintiffs are also unable to demonstrate irreparable harm for several independent reasons.

### A. Consumer Plaintiffs Fail to Show Irreparable Injury.

Two named Plaintiffs (David Bathras and Roslyn Mickens) appear to claim irreparable harm primarily from their purported inability to "acquire . . . Glock and Glock style semiautomatic pistols" as a result of SB 334. *See* ECF Nos. 21-3, 21-4. But these claims are too vague and speculative for this Court to credit.

These Plaintiffs aver that they would acquire "Glock and Glock style" pistols "in the future," or some time "after January 1, 2027," but fail to state when they might actually do so. ECF No. 21-3 ¶ 6; ECF No. 21-4 ¶ 4. It is hornbook law that "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day

will be—do not support a finding of . . . injury[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Indeed, harm is not sufficiently "imminent" for standing purposes, let alone to establish irreparable injury, just because "there is an 'objectively reasonable likelihood' that it will someday come to pass." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 429 (4th Cir. 2025). Especially in the context of a preliminary injunction, Plaintiffs must instead demonstrate that irreparable harm will occur "within a specific timeframe," namely the period they are "required to wait until the court hears [their] case[.]" *Hanson*, 120 F.4th at 244. Plaintiffs do not even attempt such a showing.

Consumer Plaintiffs also fail to demonstrate a likelihood that their preferred "Glock and Glock style" pistols will not be available for purchase at some indeterminate point in the future. For one thing, Consumer Plaintiffs do not define what they mean by "Glock and Glock style" pistols, so it is unclear what handguns would be acceptable to them. Until the Maryland Handgun Roster Board determines which limited number of models are barred from sale by SB 334, Plaintiffs cannot reasonably determine whether the entirety of the handgun market that remains will be acceptable to them.

Moreover, firearms manufacturers regularly make design modifications to accommodate state-specific firearms laws. For instance, Shadow Systems, a manufacturer of pistols with cruciform trigger bars, features firearm models for sale that incorporate features to ensure compliance with certain California state laws.[28] To take another even more recent example, Derya Arms is also a firearm manufacturer that makes pistols using cruciform trigger bars. Derya states that they are "currently developing shielded and redesigned options" that will ensure "continued

---

[28] *See, e.g.,* Shadow Systems: MR920 Elite FDE (CA Compliant), https://shadowsystemscorp.com/product/mr920-elite-fde-ca-compliant-ss-1052-ca/.

availability . . . in Connecticut [and] California," which have laws similar to SB 334.[29] The new models, according to Derya, "incorporate robust shielding of the cruciform trigger bar (or alternative designs) so they fall squarely within the legal exemptions—while maintaining . . . ergonomics, reliability, and performance" expectations. *See* Derya *supra* note 29.

Plaintiffs fail to explain whether such firearms would meet their unspecified criteria. But at the very least, Plaintiffs have not and cannot demonstrate that they will be unable to purchase any desired pistol after SB 334 goes into effect and thus cannot establish a likelihood of irreparable injury. *Accord Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 667–68 (7th Cir. 2015) ("[P]laintiffs 'cannot allege an injury from one of [multiple] options where they can choose another which causes them no injury.'") (citation omitted).

**B. Instructor Plaintiffs Fail to Show Irreparable Injury.**

Plaintiffs have also failed to establish that SB 334 will cause immediate and irreparable harm to any of the Plaintiff firearms instructors. Instructor Plaintiffs, The Machine Gun Nest, Francis M. Duffy, and Stanley Peter Jr., appear to claim two types of irreparable injury, but neither holds water.

First, these Plaintiffs aver that SB 334 will "effectively destroy the market value of Glock pistols [they] already own," because they cannot be sold under the law. ECF No. 29-3 ¶ 6; ECF No. 29-4 ¶ 6; ECF No. 29-5 ¶ 6 (similar). This claim is not correct. SB 334 permits "sales, and transport to or by a licensed firearms dealer or manufacturer who is: . . . acting to sell . . . a machine gun convertible pistol to a licensed firearm dealer in another state or to an individual purchaser in another state" through such a dealer. *See* Exhibit 4 § 4-302(3)(ii). In other words, licensed firearm

---

[29] Derya, *Understanding Connecticut's New "Convertible Pistol" Law – And What It Means for Responsible Gun Owners*, (April 25, 2026), https://perma.cc/L23Q-XRV6.

dealers in Maryland, such as The Machine Gun Nest, are permitted to sell machinegun convertible pistols to dealers in other states or to individuals in other states through licensed firearms dealers, so long as such sales are otherwise allowed under other State and federal laws. And non-licensed individuals in Maryland, such as Plaintiffs Duffy and Peter, are permitted to sell machinegun convertible pistols to licensed dealers so long as those dealers act to sell those pistols to other states as described above, again so long as they comply with other State and federal laws. Accordingly, Plaintiffs fail to demonstrate any likely loss in "market value" in their firearms.[30]

Second, these Plaintiffs aver that their "instruction programs" that involve the "temporary transfer of factory stock Glock pistols to students" will be impeded by SB 334. ECF No. 29-5 ¶ 6; ECF No. 29-3 ¶ 6 (similar); ECF No. 29-4 ¶ 6 (similar). In fact, SB 334 specifically permits the "temporary gratuitous exchange of machine gun convertible pistols." Exhibit 4 § 4-302(13). Plaintiffs contend that this "provision rules out temporary transfers or receipts of Glocks by students in *paid* instruction." ECF 29-1, at 29. This is a misreading of the statute. The statute states that to qualify under the exception, the temporary "exchange," or the giving of a pistol, must be "gratuitous," or free. With respect to Plaintiffs' activities, that appears to be the case, namely the pistols are provided for free to their students for temporary use. *See, e.g.,* ECF No. 29-5 ¶ 5 ("The Machine Gun Nest currently has nearly 100 classes projected through 2027, all of which incorporate the temporary transfer of factory stock Glock pistols to students."). And it is the "instruction for which [Plaintiffs] receive monetary compensation," not the temporary exchange of pistols. ECF No. 29-3 ¶ 5; ECF No. 29-4 ¶ 6 (same); ECF No. 29-5 ¶ 6 (same).

[30] Plaintiffs are incorrect to suggest that any modicum of economic harm is inherently irreparable. ECF No. 21-1, at 17; *see, e.g., Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016) (agreeing that in suit against state "financial harm . . . could be redressed (although that would, as a result of the Eleventh Amendment, have to be in a state court action[])").

Further, even if these Plaintiffs decide to sell their prior collection of Glock pistols and "replace" them "with other handguns for use in instruction," as explained above, Plaintiffs cannot show that such an exchange would result in any financial loss. *See* ECF No. 29-3 ¶ 6; ECF No. 29-4 ¶ 6 (same). Accordingly, Plaintiffs are not likely to suffer any irreparable injury with respect to their instruction activities.

### C. Gun Store Plaintiffs Fail to Show Irreparable Injury.

Plaintiff businesses, Engage Armament, Atlantic Guns, and the Machine Gun Nest, are similarly unable to demonstrate irreparable harm through their primary claim of lost profits. While all Plaintiff gun stores claim to sell pistols with cruciform trigger bars, none can show that it is likely to suffer any "lost profits" from SB 334. *See, e.g.,* ECF No. 29-6 ¶¶ 5-6. And for good reason, Plaintiffs' future sales are dependent upon the independent actions of manufacturers and customers under SB 334. *Accord Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 373 (D.D.C. 2018) (holding no irreparable injury in part because "many of the injuries Plaintiffs claim will befall them are speculative and dependent on the actions of third parties").

As noted above, the few manufacturers with pistols subject to SB 334 may adapt their designs to comply with Maryland law. And even if some fewer handguns with cruciform trigger bars are available for sale, Plaintiffs provide no allegation that customers who would ordinarily buy such pistols at their stores will refrain from buying guns altogether, rather than simply purchase one of the many handguns that will remain available.[31]

---

[31] Engage's website, for instance, features over 57 webpages of 24 distinct handgun models each, totaling well over 1,300 distinct handgun models. *See* Engage Armament, Handguns: Semiautomatic, https://shop.engagearmament.com/handguns/semi-automatic-handguns.

As Plaintiffs do not and cannot attempt to predict the actions of manufacturers and customers in reaction to SB 334, they have not shown "that any Plaintiff is likely to lose significant business if [SB 334] goes into effect." *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 812 (D. Or. 2022); *see also NJOY, LLC v. International Trade Comm'n*, No. 3:25-CV-930, 2026 WL 1697073, at *11 (E.D. Va. June 11, 2026) ("[G]eneralized allegations of harm to relationships with customers . . . are simply too speculative at this stage to satisfy the irreparable harm prong.").

**D. Association Plaintiffs Fail to Show Irreparable Injury.**

Finally, Association Plaintiffs, the National Rifle Association, Firearms Policy Coalition, Second Amendment Foundation, and Maryland Shall Issue, each bring suit only on behalf of their members and similarly fail to establish irreparable injury.

As a threshold matter, these groups lack associational standing, because any injury to their membership "will turn on the kind of individualized proof that requires the participation of its members in this suit." *See Association of Am. Railroads v. Hudson*, 144 F.4th 582, 593–94 (4th Cir. 2025); *see also Hanover County Unit of the NAACP v. Hanover County*, 461 F. Supp. 3d 280, 289 (E.D. Va. 2020) ("[A]n organization lacks standing to assert claims of injunctive relief on behalf of its members where the fact and extent of the injury . . . would require individualized proof."). For instance, any potential injury to Plaintiff gun stores (who claim to be members of certain Plaintiff associations) will depend on their prior sales of firearms affected by SB 334, and evidence that the law will cause them a substantial financial impact when it goes into effect. Similarly, with respect to Plaintiff instructors and consumers, their injury will depend on individualized showings as to their specific plans to purchase and/or use firearms, and how those plans are affected by the specific market of firearms that remain available after SB 334 goes into effect. Plaintiff organizations accordingly lack standing on behalf of their members. *See*

*VanDerStok v. Garland*, 633 F. Supp. 3d 847, 860 (N.D. Tex. 2022) (holding Firearms Policy Commission "has not carried its burden" to show associational standing in part because it failed to "clearly address" this requirement). Moreover, even if Association Plaintiffs could potentially demonstrate associational standing, their named members fail to show irreparable harm. *See North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 310 n.9 (4th Cir. 2020) (explaining that "this factor should instead consider whether the . . . members of the organizations would suffer irreparable harm in the absence of an injunction").

## III. PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH AGAINST AN INJUNCTION.

The public interest and the balance of the equities similarly weigh against Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that these factors "merge" when a government is the opposing party). Maryland has "compelling interests in public safety," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and "crime prevention," *Schall v. Martin*, 467 U.S. 253, 264 (1984), which would be undermined by an injunction of SB 334. As explained above, the ready availability of machinegun convertible pistols is a continuing public safety crisis in Maryland, and a preliminary injunction of SB 334 would allow this crisis to continue unabated.

Moreover, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020). That is especially so here, where both Marylanders and their elected officials support SB 334.[32] In sum, enjoining SB 334 would "undermine the public's interest in preventing gun violence." *Kipke*, 695 F. Supp. 3d at 663; *see also Maryland Shall Issue, Inc. v. Montgomery*

[32] *See* Hannah Gaskill, *Poll: MD voters support legislation to prohibit easily convertible pistols*, The Daily Record (February 5, 2026), https://thedailyrecord.com/2026/02/05/maryland-poll-supports-ban-convertible-automatic-pistols/.

*County*, 680 F. Supp. 3d 567, 594 (D. Md. 2023) (holding that "the public interest of reducing the risk of gun violence" favored "not prematurely enjoining" challenged law "before a final determination on constitutionality is made").

On the other side of the ledger, Plaintiffs have failed to show they are likely to suffer any injury, irreparable or otherwise, such as a loss of sales, instructional opportunities, or any violation of rights, if SB 334 remains in effect during the pendency of the litigation. The public interest and the balance of the equities accordingly favor Defendants.

## CONCLUSION

As the Supreme Court has repeatedly affirmed, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 595. The Second Amendment in fact "allows a variety of gun regulations" to proceed. *Bruen*, 591 U.S. at 81 (Kavanaugh, J., concurring) (quotation marks omitted). As Plaintiffs would have it, however, any regulation of a "popular" firearm cannot survive Second Amendment scrutiny. ECF No. 21-1, at 1; *see also* ECF No. 29-1, at 18. That cannot be—and indeed, is not—the test for whether a law infringes upon the Second Amendment right. States are instead permitted to enact legislation in line with the nation's long historical tradition of firearm regulations. *See, e.g.*, *Bruen*, 597 U.S. at 24. Pursuant to that tradition, states have always "respond[ed] to the calls of their citizens to *do something* about the horrors wrought by excessively dangerous weapons," particularly as technological advancements have allowed for the proliferation of previously unimagined advancements in lethality and accessibility. *Bianchi*, 111 F.4th at 471. SB 334 represents the latest in a long series of laws properly designed to regulate certain firearms that are uniquely dangerous and particularly suited for criminal activity, while preserving the core right of armed self-defense. *See id.* at 471-72. This Court should accordingly deny Plaintiffs' Motions.

Dated: August 21, 2026

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Michael Drezner
MICHAEL DREZNER
Federal Bar No. 31784
SARA R. FABER
Federal Bar No. 21893
JOSHUA R. CHAZEN
Federal Bar No. 06837
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
mdrezner@oag.maryland.gov
sfaber@oag.maryland.gov
jchazen@oag.maryland.gov
(410) 576-6959 / 7833 / 7058
(410) 576-6955 (facsimile)

Attorneys for Defendants

**REQUEST FOR HEARING**

Pursuant to Local Rule 105.6, Defendants respectfully request a hearing on Plaintiffs' Motions for Preliminary Injunction.

/s/ Michael Drezner
MICHAEL DREZNER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 21, 2026, a copy of the foregoing was served on all counsel of record via this Court's electronic filing service.

/s/ Michael Drezner
MICHAEL DREZNER