**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DAVID J. BATHRAS, SR., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>WESTLEY MOORE, *et al.*,<br><br>*Defendants.* | Case No. 1:26-cv-02074-RDB |
| FRANCIS M. DUFFY, Ph.D *et al.,*<br><br>*Plaintiffs,*<br><br>v.<br><br>WESTLEY MOORE, *et al.*,<br><br>*Defendants.* | Case No. 1:26-cv-02647-RDB |

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The Glock-style handgun ban violates the Second Amendment. ........ 1

A. Plaintiffs' challenge to the Glock-style handgun ban is sufficiently definite. ........ 1

B. The Glock-style handgun ban regulates conduct falling within the plain text of the Second Amendment. ........ 2

1. "Conditions and qualifications on the commercial sale of arms" that ban the sale of Glock-style handguns must be analyzed under *Bruen*'s historical framework. ........ 3

2. Maryland's alternative historical evidence does not support banning arms in common use. ........ 6

C. There is no tradition of historical regulation that permits banning a common arms, including Glock-style handguns. ........ 8

1. Glock-style handguns are extremely common. ........ 8

2. Maryland's alternative historical evidence does not support banning arms in common use. ........ 11

i. This case does not call for "nuanced analysis." ........ 12

ii. Laws restricting armed groups are nothing like a ban on sales of common handguns. ........ 13

iii. *Heller* rejects gunpowder storage restrictions as a valid historical analogue for a handgun ban. ........ 14

iv. Bowie knife and "blunt force" weapons restrictions at most demonstrate that "dangerous and unusual" weapons can be restricted. ........ 15

v. Twentieth century evidence is irrelevant. ........ 16

II. A preliminary injunction is warranted. ........ 17

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ANJRPC v. Att'y Gen. New Jersey*,
183 F.4th 211 (3d Cir. 2026). .................. 12, 15, 16

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) .................. 6, 7, 8, 10, 11, 15, 16

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025). .................. 19, 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008). .................. 1, 3, 4, 6, 8, 9, 10, 11, 12, 14, 19

*Elite Precision Customs LLS v. ATF*,
No. 25-11206, 2026 WL 2796983 (5th Cir. Sep. 18, 2026). .................. 19

*Express Scripts, Inc. v. Anne Arundel Cnty.*,
493 Md. 329 (2026). .................. 16

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024). .................. 9, 14

*Hirschfeld v. ATF*,
14 F.4th 322 (4th Cir. 2021). .................. 4

*Hirschfeld v. ATF*,
5 F.4th 407 (4th Cir. 2021). .................. 4

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977). .................. 20

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026). .................. 5, 15, 16

*Maryland Shall Issue, Inc. v. Hogan*,
971 F.3d 199 (4th Cir. 2020). .................. 19, 20

*McCoy v. ATF*,
140 F.4th 568 (4th Cir. 2025). .................. 13, 16

*McDonald v. City of Chicago*,
561 U.S. 742 (2010). .................. 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022). .................. 1, 8, 12, 13, 17

*Reese v. ATF*,
127 F.4th 583 (5th Cir. 2025). .................. 4, 6

*Rigby v. Jennings*,
No. 21-1523, 2026 WL 2664371 (D. Del. Sep. 10, 2026). .................. 6

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987). .................. 17

*SFFA v. President and Fellows of Harv. Coll.*,
600 U.S. 181 (2023). .......... 20

*Silver Spring Jewish Ctr., Inc. v. Montgomery Cnty.*,
No. DKC-26-2963, 2026 WL 2664123 (D. Md. Sep. 10, 2026). .......... 17

*Staples v. United States*,
511 U.S. 600 (1994). .......... 11, 17

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014). .......... 2

*Taylor v. Grubbs*,
930 F.3d 611 (4th Cir. 2019). .......... 7

*Teter v. Lopez*,
125 F.4th 1301 (9th Cir. 2025). .......... 15

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023). .......... 15

*United States v. Bridges*,
150 F.4th 517 (6th Cir. 2025). .......... 16

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023). .......... 4

*United States v. Gould*,
163 F.4th 795 (4th Cir. 2026). .......... 5

*United States v. Hemani*,
608 U.S. 772 (2026). .......... 13, 14

*United States v. Hosford*,
843 F.3d 161 (4th Cir. 2016). .......... 4

*United States v. Lane*,
689 F. Supp. 3d 232 (E.D. Va. 2023). .......... 6

*United States v. Price*,
111 F.4th 392 (4th Cir. 2024). .......... 5

*United States v. Rahimi*,
602 U.S. 680 (2024). .......... 4, 8, 12

*Wolford v. Lopez*,
146 S. Ct. 2032 (2026). .......... 1, 5, 6, 7, 8, 12, 13, 14, 16, 17

**Statutes & Constitutional Provisions**

1752–73 Mass. Acts 647–48 .......... 14

1791 N.H. Laws 721 .......... 14

1797 N.J. Laws 179 .......... 14

1838–39 Wis. Sess. Laws 368 .......... 14

1846 Mich. Pub. Acts 679 .......... 14

1857 R.I. Acts & Resolves 532 .......... 14

18 U.S.C. § 922(g)(4) .......... 5

MD. CODE ANN., CRIM. LAW
§ 4-302(3)(ii) .......... 18, 19
§ 4-302(13) .......... 19
§ 4-305.2(b) .......... 2

MD. CODE ANN., PUB. SAFETY
§ 5-124 .......... 3
§ 5-405(a)(1) .......... 15

ME. STAT. tit. 12, § 5 (1840) .......... 14

U.S. CONST. amend. II. .......... 1

**Other Authorities**

J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13 (2025). .......... 12

Br. of Violence Pol'y Ctr. et al. as Amici Curiae, *Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 136348 (Jan. 11, 2008). .......... 12

*Gratuitous*, THE AM. HERITAGE DICTIONARY, https://perma.cc/U92M-XLK5. .......... 19

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEG. 223 (2024). .......... 16

*National Firearms Act Handbook*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, U.S. DEP'T OF JUST. (Apr. 2009), https://perma.cc/PSZ8-WWL2. .......... 17

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban-Cases—Again*, PER CURIAM, HARV. J.L. & PUB. POL'Y (Sep. 27, 2023), https://perma.cc/Q6CA-CTH5. .......... 13

## INTRODUCTION

The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), held that D.C. could not ban common handguns consistent with the Second Amendment. *Heller* controls the outcome of this case. The Glock-style handguns that are the target of Maryland's ban are, by the State's own admission, not dangerous or unusual arms, but common and ordinary semiautomatic handguns that can be, if illegally modified, converted into machineguns. But there is no history of restricting common arms that could be illegally misused or modified. And there similarly is no history of prohibiting the commercial or private sale of firearms that citizens are constitutionally entitled to possess. For these reasons and those that follow, this Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

### I. The Glock-style handgun ban violates the Second Amendment.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. amend. II. In assessing whether a law violates the right protected by the Second Amendment, courts employ a two-step analysis. "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language." *Wolford v. Lopez*, 146 S. Ct. 2032, 2043 (2026). "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional—which means that it *may* violate the preexisting right that the Amendment codified." *Id.* at 2044. At *Bruen*'s second step, the State bears the burden to "demonstrat[e] that [the challenged law] is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). It has failed to do so.

#### A. Plaintiffs' challenge to the Glock-style handgun ban is sufficiently definite.

Maryland begins by arguing that Plaintiffs have brought a "facial challenge" and they are

unlikely to succeed on the merits because "the Maryland Handgun Roster Board" has not yet published its list of firearms that are banned. Md. Br. at 11–12. This argument is mistaken. First, the State does not dispute that the challenged law targets at least *some* Glocks and Glock-style pistols because these pistols have cruciform trigger bars and are convertible with illegal switches. *See, e.g.*, Raymond Decl. ¶ 9; Monica Decl. ¶¶ 40–46. While the Maryland State Police must "publish[] a list of prohibited machine gun convertible pistols." MD. CODE ANN., CRIM. LAW § 4-305.2(b), that list is certain to include Glocks because they are the *very pistols* that the State asserts are being illegally converted using illegal switches. Md. Br. at 3–4, 6–7. The State cannot have it both ways.

Second, that the list has not yet been published is irrelevant to whether Plaintiffs can successfully challenge the law, "facially" *or* "as-applied." It is undisputed that the law will bar *some* subset of Glock-style pistols (a term we use here, and throughout, to denote not just pistols made by Glock with a cruciform trigger bar but also other pistols made by other manufacturers that similarly fall within the textual scope of Maryland's ban), if not all of them. *See* Monica Decl. ¶¶ 36, 37. Plaintiffs, who own Glock-style handguns, wish to purchase other Glock-style handguns, train others with Glock-style handguns, and sell Glock-style handguns, have standing to challenge Maryland's ban on Glock-style handguns, even if Maryland may at some point in the future carve some guns out of the ban by regulation. Today, what Plaintiffs and this Court have to go on is the statute, and the statute, on its face, covers Plaintiffs' proposed course of conduct. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014).

### B. The Glock-style handgun ban regulates conduct falling within the plain text of the Second Amendment.

Maryland defends its ban on Glock-style handguns at both steps, but its arguments that its law does not even *implicate* the Second Amendment because it does not regulate conduct

falling within the "plain text" should not detain this Court for long. As Plaintiffs explained in their briefs, Maryland's law undoubtedly applies to "the people," it concerns "arms," and it restricts both "keep[ing]" and "bear[ing]" them because it bars ordinary Maryland residents from acquiring Glock-style handguns and thereby prevents them also from owning or carrying them. Bathras Br. at 9–10; Duffy Br. at 14–18. Maryland offers two counterarguments that it suggests takes this case outside the scope of the Second Amendment entirely: "(1) the law imposes permissible conditions on the commercial sale of arms, and (2) pistols that are easily convertible to machineguns are excessively dangerous weapons not covered by the Second Amendment." Md. Br. at 13. Neither argument is consistent with the Supreme Court's binding precedent.

1. **"Conditions and qualifications on the commercial sale of arms" that ban the sale of Glock-style handguns must be analyzed under *Bruen*'s historical framework.**

Taking these arguments in turn, whether a law "imposes *permissible* conditions on the commercial sale of arms" is a question that requires running the full *Bruen* analysis. *Id.* (emphasis added). There is no exception from the "plain text" for laws that "impos[e] conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, and a ban on the sale of Glock-style handguns does not qualify as a mere "condition … on the commercial sale." *Id.* First, the Glock-style handgun ban restricts **all** sales and transfers, including on the **non-**commercial secondary market, as permitted by State law. MD. CODE ANN., PUB. SAFETY § 5-124; *see* Duffy Decl. ¶ 5 ("But for SB 334, I would acquire factory stock Glock pistols either from a State licensed dealer or on the secondary market on or after January l, 2027."). Such transfers between individuals are not "commercial."

Second, the Supreme Court has not said that "conditions and qualifications on the commercial sale of arms" fall outside the Second Amendment's plain text. *Heller* stated:

> Although we do not undertake an exhaustive historical analysis today of the full

> scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27. The Court referred to these as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

But the State gets it wrong when it implies that this "now-famous caveat," *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023), *cert. granted, judgment vacated, and remanded in light of United States v. Rahimi*, 144 S. Ct. 2707 (2024) (mem.), excised commercial restrictions from the "plain text" analysis. The term "conditions and qualifications on the commercial sale of arms" refers to "a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *Hirschfeld v. ATF*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *see also United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) (involving unlicensed commercial sales). The phrase cannot be stretched to cover "a functional prohibition" on a type of arms, *see Hosford*, 843 F.3d at 166, such as the Glock-style handgun that the State itself suggests might eliminate fully a quarter of the market, *see* Md. Br. at 9. Under *Bruen*, the only way to determine whether the Ban is permissible is by applying the "*Bruen* analysis." *See Reese v. ATF*, 127 F.4th 583, 590 n.2 (5th Cir. 2025).

*Heller* did not purport to be condcuting a "textual" analysis in this passage either. Rather, this quotation comes from Part III of the *Heller* majority opinion, which the Court described as delineating "the historical understanding of the scope of the right." 554 U.S. at 625. For example, *Heller* found presumptively constitutional laws forbidding "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. Such laws have been analyzed by the Fourth Circuit for

consistency with the *history* of the Second Amendment at *Bruen*'s second step. *See Kipke v. Moore*, 165 F.4th 194, 207–08 (4th Cir. 2026) (holding "sensitive-place" laws must be analyzed through "the historical tradition analysis").

The Fourth Circuit's decision in *United States v. Gould* is particularly instructive on this front. *See* 163 F.4th 795 (4th Cir. 2026). In that case, the Fourth Circuit was urged by the government to conclude that the federal law prohibiting possession of a firearm by a person who has been "adjudicated as a mental defective or who has been committed to a mental institution," 18 U.S.C. § 922(g)(4), was constitutional solely based on this dictum from *Heller*, *see Gould*, 163 F.4th at 799. The Court rejected that argument, finding that the law "bars an individual who is otherwise law-abiding from possessing a weapon in common use for a common purpose" and thus "[t]he conduct the statute prohibits is therefore covered by the Second Amendment's plain text and is thus presumptively protected." *Id.* at 800. The court explained that "we can gauge the constitutionality of § 922(g)(4) by looking at the nation's history and tradition of restricting firearms access for persons deemed to be dangerous to themselves or others, which includes at least some deemed to be dangerous because of mental illness." *Id.*

If there were any doubt on this point, the Supreme Court's decision in *Wolford* removed it. There, the Court abrogated Fourth Circuit precedent that had folded historical inquiries into the first, "plain text," step of *Bruen*. *See, e.g., United States v. Price*, 111 F.4th 392, 399–400 (4th Cir. 2024) (en banc). The Court emphasized that the "plain text" inquiry involves just "three subsidiary questions." *Wolford*, 146 S. Ct. at 2043. "[D]oes the law apply to 'the people'—which is to say, to 'all members of the political community'?" *Id.* "[D]oes it concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes?" *Id.* And finally, "does the law place any restriction on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms?" *Id.* The State's attempt to narrow the text to exclude certain *sales* restrictions

is therefore inappropriate (the State does not dispute that the right to keep and bear arms includes the right to acquire arms). *See* Bathras Br. at 10; Duffy Br. at 16–17.

*Wolford* did not ask whether a law placed a "meaningful constraint" or "meaningfully interferes with their right of armed self-defense." Md. Br. at 13–14 (citation omitted). It asked whether it imposed "any restriction" at all, and if it did, that was enough to move past the "plain text" stage. *Wolford*, 146 S. Ct. at 2043. A law that bans the sale of many of the most popular handguns in the Country necessarily meets this standard. *Cf. Rigby v. Jennings*, No. 21-1523, 2026 WL 2664371, at *10 (D. Del. Sep. 10, 2026) ("[T]he Manufacturing and Assembly Ban places restrictions on possessing firearms because it prevents law-abiding citizens from acquiring their self-defense firearm of choice."). That Marylanders may be able to acquire different handguns is irrelevant. *See Heller*, 554 U.S. at 629 (explaining that it is "no answer to say … that it is permissible to ban the possession of handguns so long as the possession of … long guns … is allowed"); *Reese*, 127 F.4th at 590 (rejecting argument that would "exclude[] the most prevalent, accessible, and safe market to exercise the right").

2. **A ban on Glock-style handguns is a ban on "Arms."**

Maryland's second "plain text" argument fares no better. Maryland argues that Glock-style firearms are "[d]angerous and unusual weapons [that] can 'be banned without infringing upon the right to bear arms.' " Md. Br. at 14–15 (quoting *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024) (en banc)). *Bianchi* dealt with Maryland's ban on the AR-15 platform rifle and held that those weapons were not "Arms" within the scope of the Second Amendment's plain text. *See* 111 F.4th at 452. As explained below, that reasoning has been abrogated by *Wolford*. This Court is not bound to follow Fourth Circuit precedent that has been "specifically rejected" or "clearly undermined" by the Supreme Court. *United States v. Lane*, 689 F. Supp. 3d 232, 240 (E.D. Va. 2023) (quoting *Quingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) and *United*

*States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998)). "This is so even when [the] prior precedent is directly on point." *Taylor v. Grubbs*, 930 F.3d 611, 621 (4th Cir. 2019) (Richardson, J., dissenting).

*Bianchi* acknowledged that "[a]t first blush, it may appear that [AR-15s] fit comfortably within the term 'arms' as used in the Second Amendment." 111 F.4th at 447. It concluded, however, that the "text cannot be read in a vacuum," and that even at the plain text stage, it "must be interpreted against its historical and legal backdrop." *Id.* at 447, 448. This, *Bianchi* explained, meant that its task at step one was to "assess the historical scope of the right to keep and bear arms to determine whether the text of the Second Amendment encompasses the right to possess the assault weapons at issue." *Id.* at 448. *Wolford* rejects that analysis. Whether something is an "Arm" is determined by whether it is "*any* weapon customarily used for offensive or defensive purposes," 146 S. Ct. at 2043 (emphasis added), a bar that Glock-style handguns easily clear, *see* Bathras Br. at 10–14; Duffy Br. at 19–20; Monica Decl. ¶¶ 47–50. Other purported limitations on the right, like those *Bianchi* found in the "historical and legal backdrop" against which the Second Amendment was ratified, 111 F.4th at 448, "are out of place at *Bruen*'s first step," *Wolford*, 146 S. Ct. at 2049. As Justice Barrett explained in her concurrence, attempts by lower courts to "smuggle additional limits, drawn from our regulatory tradition into the plain-text stage of the inquiry," have always been out of bounds under *Heller* and *Bruen*. *Id.* at 2054 n.1 (Barrett, J, concurring). Justice Jackson put it succinctly in her dissent, *Wolford* requires that "at step one, courts must look *only* to the 'plain text' of the Second Amendment devoid of any historical understanding." *Id.* at 2068.

These "plain text" errors impacted all of *Bianchi*, including its historical analysis. First, these errors mean that the court incorrectly placed the burden on plaintiffs to show that the firearm was in common use and was not dangerous and unusual. The holding impermissibly

relieved the State of **its** burden to justify restrictions at step two, which requires the State to show a "widespread, well-known, and widely accepted" historical tradition through analogues that satisfy the "how" and "why" inquiries. *Id.* at 2053 (majority op.). Second, by incorrectly placing the common use inquiry at step one, *Bianchi* incorrectly treated common use as a necessary, but not sufficient condition for protection. *See* 111 F.4th at 460 ("[W]eapons that are *not* in common use can safely be said to be *outside* the ambit of the Second Amendment. But the logic does not work in reverse."). Having so cabined the concept, it treated common use as a non-issue when it turned to historical analogy. But as Plaintiffs have explained, and will discuss in more detail below, *Heller* and the history of arms restrictions cannot be understood except through the lens of "common use." *See* Bathras Br. at 10–11; Duffy Br. at 23–24.

Thus, it is beyond question that Maryland's Ban implicates the plain text of the Second Amendment and any suggestion *Bianchi* requires this Court to find otherwise is wrong.

### C. There is no tradition of historical regulation that permits banning a common arms, including Glock-style handguns.

At *Bruen*'s second step the burden is on Maryland to prove the constitutionality of its ban on Glock-style handguns by showing it is "relevantly similar" to historical limitations placed on the right. *Bruen*, 597 U.S. at 29. Although "not mechanical," *Wolford*, 146 S. Ct. at 2044, this involves a "disciplined," *id.*, "reasoned analysis," *McDonald v. City of Chicago*, 561 U.S. 742, 804 (2010) (Scalia, J., concurring), the results of which are governed by "principles" that can be derived from "our regulatory tradition," *United States v. Rahimi*, 602 U.S. 680, 692, 698 (2024).

#### 1. Glock-style handguns are extremely common.

As Plaintiffs have explained, "the relevant historical work has been done by the Supreme Court in *Heller*." Bathras Br. at 10; *see also* Duffy Br. at 23. *Heller* held that history permits restrictions only on "dangerous and unusual weapons," but arms that are "in common use" are

categorically protected. *See* 554 U.S. at 627. "Glocks and other handguns with cruciform trigger bars are arms in common use for lawful purposes under *Heller* and that reality is dispositive of the Step Two inquiry." Duffy Br. at 19. The State, for its part, treats "common use" and "dangerous and unusual" as considerations for the textual, step one, inquiry. *See* Md. Br. at 15, 17 n.15. The State offers no response to *Wolford* or to Plaintiffs' reading of *Heller* itself, which emphasized that *the reason* that the handguns could not be banned was because they were "in common use." *See, e.g. Hanson v. District of Columbia*, 120 F.4th 223, 260 (D.C. Cir. 2024) (Walker, J., dissenting) (explaining that "[h]andguns cannot be categorically banned *precisely because* they are in common use for lawful purposes"). Rather, the State leans on now-abrogated Fourth Circuit precedent, including *Bianchi*. *See* Md. Br. at 17 n.15. As discussed above, *Wolford* removes any possibility of comingling the "plain text" analysis with a factor that *Heller* explicitly said was "fairly supported by … historical tradition." 554 U.S. at 627. "Common use" must, therefore, be a step two consideration and is dispositive.

Maryland does not even attempt to refute the notion that Glock-style handguns are "in common use" and subject to bans of this type in just four states. *See* Bathras Br. at 12–13. In defending its law, it points to testimony before the state legislature that assured that "roughly 75 to 80 percent of the pistol market would simply be untouched by this bill." Md. Br. at 9 (quoting *S. Jud. Proceedings Comm. Hearing on S.B. 334* (oral testimony of Greg Lickenbrock), https://perma.cc/ZCH9-C3RJ). But that means that the challenged law is expected to blot out roughly *a quarter* of the pistol market, including handguns approved for sale by Maryland's Handgun Roster Board.

Maryland does, however, argue that these firearms are, despite their commonality, "dangerous and unusual" because they can be converted, through the use of an illegal "switch," into machineguns. *See* Md. Br. at 15. There are at least two problems with this argument. First,

*Heller* forbids disentangling the concepts of "common use" and "dangerous and unusual." There were all sorts of reasons why *Heller* was urged to hold that handguns were "dangerous and unusual" weapons by the defenders of D.C.'s law. Justice Breyer explained in his dissent that handguns "are specially linked to urban gun deaths and injuries [and] are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). Just as the State now notes that "machinegun convertible pistols" are being recovered at crime scenes at increased rates, *see* Md. Br. at 8, Justice Breyer bemoaned that "[h]andguns are involved in a majority of firearm deaths and injuries in the United States," as the weapon used in "81% of firearm-homicide[s]," and further that polls of current inmates revealed that "83.2% of state inmates and 86.7% of federal inmates said they were armed with a handgun" when they committed their crimes, *Heller*, 554 U.S. at 697–98 (Breyer, J., dissenting). The *Heller* majority did not dispute these statistics, it treated them as *irrelevant* to the question of whether handguns were protected. *See id.* at 634. What *did* matter was that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* at 629.

Second, nothing supports a finding that factory-stock Glock or Glock-style handguns are "dangerous and unusual" weapons. Even though *Bianchi*'s reasoning has been refuted by *Wolford*, the State relies on it in arguing that even if a firearm is "common" it can still be banned if it is "excessively dangerous" out of proportion to its utility for self-defense. Md. Br. at 15–16. But *Bianchi* itself pointed to *Glock handguns* as the paradigmatic common and non-excessively dangerous firearm against which it contrasted the AR-15 rifle. *See* 111 F.4th at 455 (contrasting the "pathway of tissue destruction in the order of one inch to two inches" created by a "Glock 19" with the allegedly " 'catastrophic' damage caused by AR-15 rounds"); *see also id.* at 459 (finding that handguns generally are better suited to self-defense because they are "concealable"

and easier "to carry while conducting daily activities"); *id.* at 451 (contrasting "weapons beyond the scope of the Second Amendment" with "handguns" based on their "ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection").

Furthermore, the State's argument is not that "machinegun convertible pistols" are "excessively dangerous" as sold. Rather, the State's argument is that machinegun *converted* pistols are. *See* Md. Br. at 15–16 (arguing that "minimal effort" can turn an admittedly "small and concealable pistol 'into a weapon of mass violence' "). But it has no support for the principle that an ordinary handgun, which the Supreme Court has already held is protected in *Heller*, can be considered "dangerous and unusual" because it *could be turned into a different* kind of weapon by adding an illegal part or making other criminal alterations to the handgun. That is, as Plaintiffs argued in their opening briefs, not the line that American law has ever drawn. *Cf. Staples v. United States*, 511 U.S. 600, 612 n.6 (1994) (explaining that "every owner of a semiautomatic rifle or handgun" is potentially the owner of a firearm that is "convertible" into a machinegun). While short-barreled or "sawed-off" shotguns have been regulated strictly at least since the National Firearms Act of 1934, for instance, *see Heller*, 554 U.S. at 621–22, any shotgun is just a few minutes of work with a hacksaw away from becoming a sawed-off shotgun, and yet they have *never* been so regulated, *see* Bathras Br. at 15; Duffy Br. at 25. More broadly, unlawful actions of third parties with firearms have never been understood to be a reason to bar the sale, manufacture, or possession of otherwise ordinary and lawful products. *See* Duffy Br. at 26–28 (discussing PLCAA and the common law); *see also* Bathras Br. at 15 (citing historical "trap gun" restriction). The State has banned *ordinary*, *unconverted* semiautomatic pistols. Even the State does not suggest that such arms are "dangerous and unusual" as sold. That resolves this case without the need for any independent historical analysis.

2. **Maryland's alternative historical evidence does not support banning arms in**

**common use.**

**i. This case does not call for "nuanced analysis."**

The State argues that this case calls for a "more nuanced approach" to historical analysis because the Glock-style firearm ban confronts "two technological leaps," the existence of machineguns and 3D printing of firearm parts, and "unprecedented societal concerns" in the form of "the use of modified handguns to facilitate mass violence." Md. Br. at 17–19. First, the "more nuanced approach" mentioned in *Bruen* does not permit abandoning the required historical analysis; it simply requires "a more difficult exercise of judgment" where the restricted conduct in question is "distinctively modern." *Wolford,* 146 S. Ct. at 2045. *See also ANJRPC v. Att'y Gen. New Jersey*, 183 F.4th 211, 232–33 (3d Cir. 2026) (en banc); J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 32 n.144 (2025). There is nothing "distinctively modern" about selling, purchasing or transferring a handgun.

The problem of firearm violence, including "mass violence," is not new. See *ANJRPC*, 183 F.4th at 246 (noting the relevant "societal concern" is people " 'misusing weapons to harm or menace others,' " which is identical to the same concern at the Founding) (quoting *Rahimi*, 602 U.S. at 693). *Heller* was decided in 2008, the year after the Virginia Tech shooting, which is still one of the worst mass shootings in our Nation's history. That shooting was committed with the same ordinary handguns that *Heller* held were protected. The problem of mass shootings was raised in *Heller*, *see, e.g.*, Br. of Violence Pol'y Ctr. et al. as Amici Curiae, *Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 136348, at *24, (Jan. 11, 2008), and the Court acknowledged "the problem of handgun violence in this country" as "a serious problem," 554 U.S. at 636. And yet *Bruen* pointed to *Heller* as "exemplif[ying]" a "straightforward historical inquiry." 597 U.S. at 27. Nor can "technological changes" in the types of arms justify altering the *Bruen* analysis. The handguns at issue in both *Bruen* and *Heller* would also have been novel to the Founders, yet those

cases applied the ordinary *Bruen* analysis.

Finally, the common use principle itself accounts for social and technological changes resulting from advancements in firearms technology. The controlling question here is whether a given type of arm is "in common use *today*." *Id.* at 47 (emphasis added). The inquiry therefore is a dynamic one that accounts for the American people's judgment regarding what sorts of arms are appropriate for typical, lawful possession according to contemporary social and technological conditions. Any modern nuance already is accounted for in the controlling constitutional standard. *See* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban-Cases—Again* at 9, PER CURIAM, HARV. J.L. & PUB. POL'Y (Sep. 27, 2023), https://perma.cc/Q6CA-CTH5.

**ii. Laws restricting armed groups are nothing like a ban on sales of common handguns.**

The State must justify its law under the *Bruen* framework by showing that historical restrictions resemble the Glock-style handgun ban both in "how and why" they limited the right, *Bruen*, 597 U.S. at 29, and that the analogues themselves were the sort of "widespread, well-known, and widely accepted" regulations that can be considered good evidence of the scope of the right, *Wolford*, 146 S. Ct. at 2053. In so doing, evidence from the Founding era is of critical importance. *See McCoy v. ATF*, 140 F.4th 568, 574–75 (4th Cir. 2025).

The State's first proposed analogue fails for lack of a similar "how" or "why." The State argues that "[i]n response to the risk of violence caused by armed groups, '[t]he American Colonies and United States followed English common law by treating armed groups as riots or unlawful assemblies.' " Md. Br. at 20–21 (citation omitted). But these laws were anti-riot measures targeting only people who carried weapons in groups bent on lawlessness and thus are wholly unlike the bans at issue here. *See United States v. Hemani*, 608 U.S. 772, 783 (2026) (rejecting analogues which "targeted different kinds of people, did so for different reasons, and

operated in different ways"); *Wolford*, 146 S. Ct. at 2051 (rejecting Hawaii's reliance on trespass and poaching laws). For instance, the Massachusetts law, on which the State relies, targeted groups of *actors* (or those posing as actors), who the text of the statute suggests were creating mayhem or extorting people. 1752–73 Mass. Acts 647–48. None of the other laws the State cites simply banned an aggregation of armed people, either. Rather, they banned groups from "unlawfully[,] riotously[,] routously[,] and tumultuously assembl[ing]" and even then only made it a crime if the riotous assembly refused to disband at the direction of the sheriff. *See* 1791 N.H. Laws 721; *see also* 1797 N.J. Laws 179 (same); 1838–39 Wis. Sess. Laws 368 (substantially the same); ME. STAT. tit. 12, § 5 (1840) (substantially the same); 1846 Mich. Pub. Acts 679 (substantially the same); 1857 R.I. Acts & Resolves 532, 533. Such laws had no impact on law-abiding firearm owners who were not rioting, much less on the acquisition of a firearm.

**iii. *Heller* rejects gunpowder storage restrictions as a valid historical analogue for a handgun ban.**

The State next points to laws "concerning the storage and use of gunpowder." Md. Br. at 21. These also fail for lack of a similar "how" or "why" to the modern restriction. Indeed, *Heller* rejected reliance on such laws, concluding that "they do not remotely burden the right of self-defense" to the same degree. 554 U.S. at 632; *see also Hanson*, 120 F.4th at 235 ("The suggestion that [gunpowder storage laws] limited the Second Amendment right to keep and bear arms is silly."). Maryland argues these laws and its Glock-style handgun ban are similar in that they are both aimed at protecting people "from infrequent but devastating harm by regulating a component necessary to the firing of a firearm." Md. Br. at 22 (citation omitted). Even as phrased by the State, that argument does not work—Maryland is banning a firearm, not a part of a firearm. It already bans "switches." And the historical laws did not ban any firearms at all. They are therefore not relevantly similar.

**iv. Bowie knife and "blunt force" weapons restrictions at most demonstrate that "dangerous and unusual" weapons can be restricted.**

The State's analogies to restrictions on Bowie knives, *id.* at 22, and on "blunt-force weapons," *id.* at 24, fare no better. It argues that these historical restrictions are part of the "storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately." *Id.* at 25 (quoting *Bianchi*, 111 F.4th at 462). But, again, *Wolford* abrogates *Bianchi*'s holding that legislatures can ban "excessively dangerous" arms at *Bruen*'s step one as well its reasoning that placed "common use" at the "plain text" stage of the analysis. As explained above, these errors effectively invalidate its historical analysis as well because the court failed to appreciate that "common use" was *the critical feature* of these restrictions at step two. And even if that were not the case, nothing in *Bianchi*'s analysis applies to handguns in common use that have been approved for sale by the Maryland Handgun Roster Board as "useful for legitimate sporting, self-protection, or law enforcement purposes" under MD. CODE ANN., PUB. SAFETY § 5-405(a)(1). *See* Duffy Br. at 3, 12, 24.

Moreover, these restrictions on Bowie knives and blunt force weapons are not "relevantly similar" to the bans imposed by SB 334. Laws that actually banned possession or sale of these weapons were comparatively rare—"[m]ost of those regulations prohibited the concealed carry of Bowie knives, and some prohibited open carry with intent to do harm or imposed more stringent punishments where Bowie knives were used in the commission of a crime." *ANJRPC*, 183 F.4th at 244; *see also Teter v. Lopez*, 76 F.4th 938, 951–53 (9th Cir. 2023), *vacated as moot on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025). Indeed, the State cites just four sales or exceptional tax restrictions on Bowie knives (which it posits amounted to a ban on sale) that have a "how" that is plausibly comparable to the Ban. *See* Md. Br. at 23 n.18; *see also id.* at 24–25 (collecting similar laws for blunt-force weapons). That is insufficient to establish a widespread or widely accepted historical tradition. *See Kipke*, 165 F.4th at 219 (rejecting four proffered

analogues as "outliers"). Here, the State targets ordinary firearms that have been approved by the Maryland Handgun Roster Board as suitable for civilian purchase. Under the State's own conception of the case, they do not become dangerous and unusual *until* and *unless* they are illegally converted using a device (switch) that is, itself, illegal to acquire and possess. None of the State's supposed analogues banned weapons for that reason. These laws also come too late. The earliest Bowie knife law comes from 1837. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEG. 223, 298 (2024). That is too late in time. *See McCoy*, 140 F.4th at 574–75; *see also ANJRPC*, 183 F.4th at 244 (discounting these same laws for this reason).

Finally, *Wolford* instructs courts to consider whether putative analogues were "widely accepted" in addition to being "widespread." 146 S. Ct. at 2053. The State has pointed to no common law tradition or any law from any relevant era that purported to ban an otherwise legal firearm in common use just because it could be illegally "diverted, misused, or abused" by criminals. *Express Scripts, Inc. v. Anne Arundel Cnty.*, 493 Md. 329, 408–09 (2026) (collecting case law). See Duffy Br. at 23, 26–27. The State simply ignores the common law altogether. Bowie knives are no exception because they (1) were not criminally altered weapons, and (2) to the extent bans on them were considered constitutional, it was because they were viewed as "dangerous and unusual" arms. *United States v. Bridges*, 150 F.4th 517, 537 (6th Cir. 2025) (Nalbandian, J., concurring); *see also Bianchi*, 111 F.4th at 510 (Richardson, J., dissenting). That metric is the relevant historical principle, and it defeats any analogy here, where Glocks and Glock-style handguns are indisputably "in common use" for lawful purposes like self-defense by millions of Americans.

**v. Twentieth century evidence is irrelevant.**

That leaves the State to rely on twentieth century laws restricting short-barreled rifles,

short-barreled shotguns, and machineguns. The Court should simply ignore these laws as too late in time to inform our understanding of the Second Amendment. *See Bruen*, 597 U.S. at n.28; *Wolford*, 146 S. Ct. at 2053; *Silver Spring Jewish Ctr., Inc. v. Montgomery Cnty.*, No. DKC-26-2963, 2026 WL 2664123, at *9–12 (D. Md. Sep. 10, 2026). Indeed, many of these laws are of a more recent vintage than the law that was rejected in *Bruen* and the Court did not treat that law, obviously, as evidence of the proper scope of the right to keep and bear arms. Even if considered, these laws refute the State's argument as they are proof that semiautomatic arms have *not* been subject to such significant regulation. *See Staples*, 511 U.S. at 612.

In response, the State points to two ATF rulings from the 1980s holding certain semiautomatic firearms with internal components that could be modified to fire automatically qualified as "machineguns" as proof that this has not always been the case. *See* Md. Br. at 29 n.26. But evidence from almost 200 years after the ratification of the Second Amendment is worthless under *Bruen*. Moreover, Glock-style handguns are unlike the modifiable pistols discussed in ATF Rule 82-2 and 82-8, and much more comparable to the AR-15 "drop in auto-sear" discussed in ATF Rule 81-4 in that they require the addition of a separate part to convert them into automatic weapons. The ATF treats the drop in auto-sear as a machinegun, but not the AR-15, adhering to the line that Plaintiffs have argued for here. *See National Firearms Act Handbook* at 141–44, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, U.S. DEP'T OF JUST. (Apr. 2009), https://perma.cc/PSZ8-WWL2.

## II. A preliminary injunction is warranted.

Because Maryland's ban on Glock-style handguns violates the Second Amendment, Plaintiffs have met the other preliminary injunction factors as well. "[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also* Duffy Br. at 28–29; Bathras Br. at 16–17. The State

nevertheless argues that Plaintiffs cannot show irreparable harm. With respect to Bathras and Mickens, it argues that their stated intention to continue to acquire Glock and Glock-style pistols even after the January 1, 2027 effective date of the Ban is insufficient to support a claim of irreparable harm because they are insufficiently concrete and because, "[u]ntil the Maryland Handgun Roster Board determines which" specific models are barred under the act, "Plaintiffs cannot reasonably determine whether the entirety of the handgun market that remains will be acceptable to them." Md. Br. at 31–32. As to Plaintiffs Duffy, Peter, and the Machine Gun Nest, Maryland argues that they cannot show that their existing Glock-style pistols will lose "market value" because they can still be sold to individuals in other states through licensed dealers in those other states, *id.* at 33, or that the statute actually bars them from loaning Glock-style pistols to students taking firearms courses, *id.* at 34. Maryland argues that the dealer plaintiffs, Engage Armament, Atlantic Guns, and the Machine Gun Nest, cannot prove irreparable harm based on "lost profits" because "future sales are dependent upon the independent actions of manufacturers and customers under SB 334." *Id.* at 34–35 (citation omitted). Finally, as to the associational plaintiffs, National Rifle Association, Firearms Policy Coalition, Second Amendment Foundation, and Maryland Shall Issue, the State argues that they lack standing because the injuries to their members on which their claims depend will "require[] the participation of its members in the suit." *Id.* at 35–36 (quoting *Assoc. of Am. R.R. v. Hudson*, 144 F.4th 582, 593–94 (4th Cir. 2025)).

These are all arguments that go to injury in fact, not "irreparable harm." And none are valid. Again, the State does not dispute that the Glock-style handgun ban applies to all presently-owned Glock pistols, including in the inventory of the dealer plaintiffs. **All** the Plaintiffs currently possess Glocks, and the State does not dispute that they would be prohibited from selling those Glocks to another Maryland resident. SB 334 even bans transfers *to* a dealer *unless* the transfer

is part of an out-of-State sale. MD. CODE ANN., CRIM. LAW § 4-302(3)(ii). That harm is not eliminated because Plaintiffs might be able to sell to an out-of-state buyer through a dealer. Such sales to out-of-state purchasers impose monetary costs that are unquestionably injury. *See Elite Precision Customs LLS v. ATF*, No. 25-11206, 2026 WL 2796983, at *2 (5th Cir. Sep. 18, 2026). *See also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113–14 (2025) (citation omitted). As long as one plaintiff has standing to seek relief, this Court's jurisdiction is secure (and a plaintiff whose standing is based on a deprivation of their constitutional right would also show irreparable injury). *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020).

Particularly misplaced is the State's argument that Plaintiffs lack standing because the Maryland State Police has not yet specifically identified each firearm banned by the law. All the Plaintiffs allege that they would like to buy and/or sell Glocks after January 1, 2027. Bathras Decl. ¶ 6; Mickens Decl. ¶ 4*,* Duffy Decl. ¶ 5; Peter Decl. ¶ 5, Krop Decl. ¶ 6, Raymond Decl. ¶ 5. Glocks are targeted by SB344, a reality that the State does not deny. No more is required. The State's suggestion that Plaintiffs could buy *other* guns, Md. Br. at 32, is precluded by *Heller*. 554 U.S. at 629. *See Elite Precision*, 2026 WL 2796983 at *3.

Equally wrong is the State's suggestion that paid instructors who provide Glocks during instruction are merely engaged in a type of "gratuitous" transfer permitted by MD. CODE ANN., CRIM. LAW § 4-302(13). *See* Md. Br. at 34. "Gratuitous" means: "Given or granted without return or recompense; unearned" or "[g]iven or received without cost or obligation; free." *Gratuitous*, THE AM. HERITAGE DICTIONARY, https://perma.cc/U92M-XLK5. The significant costs of providing these expensive pistols during paid instruction are covered by the monetary consideration paid by students. There is nothing "gratuitous" or "free" about such transfers. *See, e.g.*, Krop. Decl. ¶¶ 5–6 (describing business of renting Glock-style handguns and "engag[ing] in the temporary transfer of such Glock pistols to students" as part of paid instruction).

The argument that the targeted dealers, such as plaintiffs Engage Armament, Atlantic Guns, and The Machinegun Nest, lack standing is even more tenuous. The State's argument requires accepting the faulty premise that banning 20-25% of the handgun market will not adversely affect one dollar of the dealers' bottom line. *See Diamond Alt.*, 606 U.S. at 114 (sustaining standing of sellers to challenge a state law that reduced sales); *MSI*, 971 F.3d at 210–11 (same). These sales are a substantial part of the revenue of Engage Armament, Raymond Decl. ¶ 4, and The Machine Gun Nest, Krop Decl. at ¶ 5. These dealers may also sue to vindicate the rights of their customers. *MSI*, 971 F.3d at 216. And because each of the aforementioned individuals and entities are members of the plaintiff associations, the associations likewise have standing. *SFFA v. President and Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023). Contrary to the State's argument, Md. Br. at 35–36, the equitable relief sought here does not require proof of injuries to their individual members because injunctive relief "will inure to the benefit of those members of the association actually injured." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Finally, Maryland's arguments regarding the balance of the equities and the public interest are predicated on this Court finding that the ban is constitutional. Because it is not, the balance of the equities and the public interest lie in Plaintiffs' favor.

**CONCLUSION**

The Court should grant Plaintiffs' motions for a preliminary injunction.

Dated: September 22, 2026

Respectfully submitted,

*/s/ Nicole J. Moss*
Nicole J. Moss, Bar No. 20222
*Attorney of Record*
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601
nmoss@cooperkirk.com
*Admitted pro hac vice
*Attorneys for Bathras Plaintiffs*

*/s/ Matthew Larosiere*
Matthew Larosiere
6964 Houlton Cir.
Lake Worth, FL 33467
Larosieremm@gmail.com
District Court Bar # 32471
Phone: (561) 452-7575

*/s/ Mark W. Pennak*
Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd, Ste. C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar # 21033
*Counsel for Duffy Plaintiffs*